EVANGELOS E. AMBATIELOS, Plaintiff, *v.* FOUNDATION COMPANY, Defendant.

Supreme Court, Special Term, New York County, October 31, 1952.

*Schur, Handler & Jaffin* for plaintiff.

*Wickes, Riddell, Bloomer, Jacobi & McGuire* for defendant.

SCHWAËTZ, J. This is an action to enforce a final judgment of the High Court of Justice, Queens Bench Division, of Great Britain. Plaintiff moves for summary judgment.

The judgment in question enforced the provisions of an oral agreement made in London in 1924. Plaintiff herein, a Greek national and retired shipbuilder who had long resided in London, was at that time well acquainted in Greek Government circles. Defendant, a New York corporation, was and is a recognized construction engineering firm. Defendant's English representative, in December, 1924, engaged plaintiff to go to Greece for the purpose of seeking contracts for defendant in connection with proposed government projects for irrigation and reclamation of the Vardar Valley. If the mission was a success, plaintiff was to receive 10% of the profits made by defendant from the contracts. Plaintiff went to Greece where his services included discussion with high officials of the Greek Government whom plaintiff knew personally. The defendant secured an unusually favorable contract.

Plaintiff's demands for payment from the defendant were ignored and in 1928 he brought suit against the defendant in the High Court of Justice of Great Britain. Defendant denied that it had entered into any agreement. The jury believed plaintiff and, in 1930, a judgment was rendered in his favor. That judgment ordered an immediate inquiry (accounting) of defendant's profits, but, on defendant's appeal to the Court of Appeal, the judgment was modified by deferring the taking of an inquiry until all of the work under defendant's contract with the Greek Government had been completed.

Apparently dissatisfied with the delay in the British Courts, plaintiff in 1936 brought an action against the defendant in the Court of First Instance of Athens, Greece, basing his claim both upon the English judgment and upon the oral contract itself. Although a default judgment was initially rendered, the defendant's motion to open the default was granted, and it was permitted to defend on the merits. Defendant contended that the agreement was against public policy, both under traditional Roman-law doctrine and under a Greek statute, enacted in 1931, that declared null and void all agreements with " intermediaries " in the obtaining of government contracts. The Greek court dismissed the complaint and rendered judgment for the defendant, holding that the agreement between the parties contravened the provisions of the 1931 statute, and that therefore the contract and the judgment based thereon were unenforcible.

Plaintiff next sought relief in this court, in 1944. That action was dismissed at the end of three years for failure to prosecute.

In 1947 (all work under defendant's contract with the Greek Government having been completed some ten years before) plaintiff returned to the British court and, in accordance with the provisions of the 1930 judgment, initiated an accounting of defendant's profits. Defendant thereupon obtained an order from the Court of Appeal directing that a hearing be had before a referee to determine whether or not plaintiff's rights under the 1930 judgment had been " defeated or otherwise impaired " by the subsequent Greek judgment or by the 1931 Greek statute. The order further provided that the parties shall " be at liberty to apply to the said Official Referee for any further directions in respect of the said Issue " (apparently an authorization to extend the scope of the reference) and that it shall be open for plaintiff to argue that defendant is estopped from now first contending that Greek law is the proper law of the contract.

Both parties actively participated in the very extensive hearing thereafter had before the referee. The latter ruled that " the rights of Ambietelos under the Judgment of Mr. Justice HORRIDGE of 1930 are not affected or defeated in England by the Greek Law 5227 or by the Greek Judgment of 1940, or by either of them ". The referee further held that, although he was of the opinion that defendant was not estopped from contending for the first time that Greek law was the proper law of the contract, he was convinced that " the presumed intention of the parties is that this bargain shall be regulated by the law of England ".

The inquiry (accounting) was thereafter held. On January 23, 1952, judgment was rendered for plaintiff, with costs and accrued legal interest thereon aggregating £44,526.3.3, which in dollars (the parties are in agreement as to the applicable rate of exchange) amounts to $123,838.39.

Plaintiff now seeks to enforce that judgment in this State. The complaint sets forth the commencement of the British action, defendant's appearance therein and the rendition of the judgment of January 23, 1952. Defendant's answer substantially admits the allegations of the complaint, but interposes seven affirmative defenses, which may be summarized as follows:

1. The agreement between the parties is contrary to the public policy of New York and to the public policy of Greece, and the British judgment based thereon is similarly contrary to our public policy and is, therefore, unenforcible.

2. The final judgment of the Court of First Instance of Athens is entitled to " full faith and credit " in this country, and plaintiff is barred thereby from maintaining this action.

3. Institution of the Greek proceeding by plaintiff constituted an abandonment of his rights under the prior judgment.

4. By reason of his institution and prosecution of the Greek action, plaintiff is estopped from denying the effect of the Greek judgment.

5. The British action was merged into the Greek final judgment.

6. The substantial variance between the pleadings and testimony of plaintiff in the British action and the pleadings and testimony of plaintiff in the Greek action so impeaches the British judgment as to require this court, in equity, to refuse recognition of the British judgment.

7. Plaintiff's statements in the British action were false and fraudulent, requiring this court to deny enforcement of the British judgment.

Defendant counterclaims for a judgment declaring that the contract and the British judgments based thereon are unenforcible, and enjoining plaintiff from taking any further proceedings to enforce the judgments or the contract. Plaintiff's reply substantially denies the allegations of the answer.

In opposition to plaintiff's motion for summary judgment, defendant contends that its defenses tender substantial triable issues of fact and, alternatively, that if there are no triable issues of fact, the motion should be denied and judgment awarded defendant in accordance with rule 113 of the Rules of Civil Practice.

The question here presented is whether the British judgment is, under the circumstances of this case, conclusive proof of liability in the courts of this State. " The general rule in this State is settled as follows: A judgment recovered in a foreign country, when sued upon in the courts of this State, is conclusive so far as to preclude a retrial of the merits of the case, subject, however, to certain well-recognized exceptions, namely, where the judgment is tainted with fraud, or with an offense against the public policy of the State, or the foreign court had not jurisdiction. (*Lazier* v. *Westcott*, 26 N. Y. 146; *Dunstan* v. *Higgins*, 138 id. 70)." (*Cowans* v. *Ticonderoga Pulp & Paper Co.*, 219 App. Div. 120, 121–122, affd. 246 N. Y. 603.)

This fundamental principle of private international law reflects a strong policy favoring the recognition of foreign judgments — a policy founded upon the desirability of putting an end to litigation and of encouraging the uniform enforcement of private rights wherever derived. In the international sphere, recognition of such foreign judgments is said to be based upon

the doctrine of comity. The Court of Appeals has said that comity " ' is something more than mere courtesy, which implies only deference to the opinion of others, since it has a substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question.' (BROWN, J., in *Mast, Foos & Co.* v. *Stover Mfg. Co.*, 177 U. S. 485, 488.) It, therefore, rests, not on the basis of reciprocity, but rather upon the persuasiveness of the foreign judgment. (*Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 111.) " (*Johnston* v. *Compagnie Generale Transatlantique*, 242 N. Y. 381, 387.)

The seven affirmative defenses set up in defendant's answer, as construed by defendant in its papers on this motion, present three lines of defense against enforcement of the British judgment. The first affirmative defense states that enforcement of the judgment would be against our public policy. The second through fifth defenses interpose the Greek judgment as a bar to the action. The remaining two defenses aver that the judgment was obtained by fraud.

In my view, these defenses tender no substantial issues of fact. They raise questions of law only which may properly be disposed of on this motion for summary judgment.

I turn first to defendant's contention that the Greek judgment, and not the British judgment, is entitled to recognition by this court — the issue raised by defendant's second through fifth defenses. This contention, in my opinion, must fail. It is generally held that where inconsistent judgments have been rendered in successive actions between the same parties, the judgment that is latest in point of time prevails. (See, e.g., *Garden Suburbs Golf & Country Club* v. *Murrell*, 180 F. 2d 435, certiorari denied 340 U. S. 822; *Donald* v. *White Lumber Co.*, 68 F. 2d 441; *Horse Creek Coal Land Co.* v. *Alderson*, 266 F. 477; *California Bank* v. *Traeger*, 215 Cal. 346; *Theological Seminary* v. *People*, 189 Ill. 439; *Clark* v. *Baranowski*, 111 Ohio St. 436; *Bateman* v. *Grand Rapids & Indiana R. R. Co.*, 96 Mich. 441, and *Watkins* v. *Siler Logging Co.*, 9 Wash. 2d 703.) As stated in Freeman's Treatise on Judgments ([5th ed.], Vol. 2, § 629) : " Rights acquired by virtue of a judgment or decree are liable to be terminated in the same manner. Consequently, though a matter has once been litigated to a final judgment if it is subsequently relitigated and adjudicated, the last judgment controls and determines the rights of the parties. The second judgment cannot be collaterally impeached by showing the first."

This rule, which has been adopted by the American Law Institute in its Restatement of the Law of Judgments, is an application of elementary *res judicata* principles. Among the matters that might have been raised in the later action was the effect of the earlier judgment between the same parties. Whether or not that issue was actually litigated, therefore, the judgment in the second action is conclusive on the question — just as it is conclusive on all other matters that were or might have been raised in the action. (Cf. *Schuylkill Fuel Corp.* v. *Nieberg Realty Corp.*, 250 N. Y. 304, 306.) It follows that when action is brought on that judgment, the court may not re-examine the effect of the earlier judgment. '' The second judgment is conclusive in the third action even though the first judgment was relied upon in the second action and the court erroneously held that it was not conclusive.'' (Restatement, Judgments, § 42, comment a.)

The rule under discussion applies alike where the actions were brought in the same State and where they were brought in different States. (Restatement, Judgments, § 42, comment e.) Where, as here, the party against whom enforcement is sought had full opportunity in the second action to argue the binding force of the earlier judgment, there is every reason for applying the rule to inconsistent judgments rendered by the tribunals of foreign nations.

Defendant contends, however, that application of the rule that the last judgment prevails must here result in a determination that the Greek judgment is a bar to the maintenance of this action. Defendant argues that the original British judgment rendered in 1930 was in the nature of a final judgment; that the 1952 judgment was merely an arithmetical computation of rights accruing under the earlier judgment; and that, therefore, the Greek decree, having been rendered subsequent to the 1930 judgment, is in reality the later judgment and consequently entitled to recognition.

With this argument, I cannot agree. In the first place, the original British judgment was not final, as that term is defined in the field of private international law, because it does not constitute an award of a sum certain, having deferred the fixing of damages until a later date. (See Goodrich on Conflict of Laws [3d ed., 1949], p. 628, and Note 41 Col. L. Rev. 878, 889–890.) Nor, secondly, is it accurate to say that the 1950 judgment was merely an arithmetical computation of rights accruing under the original judgment, for in the proceedings culminating in that judgment, defendant was permitted to interpose the

defense that the Greek judgment and the 1931 Greek statute stood in the way of the enforcement of plaintiff's rights under the contract and the prior judgment. The British court, as we have seen, expressly determined that the law of the contract was the law of England, not that of Greece, and that, therefore, the contract was valid and the 1930 judgment could be enforced by plaintiff. Finally, it is obvious that the judgment here proceeded upon (a) is a final judgment for a sum certain, and (b) was rendered subsequent to the judgment of the Court of First Instance of Athens. Under the rule regulating inconsistent judgments, therefore, it is the 1952 judgment of the High Court of Justice, Queens Bench Division, that is entitled to recognition by this court.

Defendant alternatively contends that if the Greek judgment cannot be recognized by this court, neither can the British judgment; that this court should avoid preferring one judgment over the other and refuse to enforce either. It is indeed, true, as defendant suggests, that there is some old authority for the rule that inconsistent judgments result in " an estoppel against an estoppel " which, in the language of Lord COKE, " setteth the matter at large," so that either party is free to relitigate the controversy. (49 C. J. S., Judgments, § 445; cf. *Shaw* v. *Broadbent,* 129 N. Y. 114, 125.) It may be doubted whether even this rule was applicable where the court in the second action had expressly adjudicated the effect of the prior judgment. In any event, this rule must be regarded as having been superseded by the modern doctrine, which recognizes the latest judgment as determinative of the rights of the parties, for that doctrine, as we have seen, is simply a logical application of the rule of estoppel by judgment. In sum, this court should not deny recognition to the British judgment here sued upon, solely because of the existence of the earlier Greek judgment.

As indicated above, two of the conventional grounds for avoiding recognition of the British judgment are here relied upon by defendant. The judgment is alleged to have been secured by fraud, and it is said that it would be against our public policy to enforce it.

In support of the latter defense, defendant maintains that the contract between the parties is of a type that is offensive to our public policy and that the cause of action upon which the British judgment is based is not, therefore, recognized in this State. That this is a valid ground of defense, if true, may not be doubted. (2 Beale on Conflict of Laws, p. 1412.) However, I

cannot agree that under New York law this kind of contract is against public policy.

Our decisions establish that an agreement to represent a person or firm before a government agency or officer for the purpose of securing a government contract is valid and enforcible unless it appears, either from the contract itself or from extrinsic circumstances, that the parties contemplated the use of pecuniary influence or other corrupt methods. (*Southard* v. *Boyd*, 51 N. Y. 177; *Lyon* v. *Mitchell*, 36 N. Y. 235; *Leahy* v. *Brooklyn Waterfront Terminal Corp.*, 272 App. Div. 781; *McCraith* v. *Buss*, 198 App. Div. 524; *Schwartzman* v. *Pines Rubber Co.*, 189 App. Div. 749; *Beck* v. *Bauman*, 187 App. Div. 774; cf. *Chard* v. *Ryan-Parker Constr. Co.*, 182 App. Div. 455.) On the argument of this motion, counsel for defendant conceded that no claim is made that plaintiff committed any corrupt practices in securing defendant's contract with the Greek Government. Nor is it asserted in defendant's affidavit that either party to the agreement contemplated any corrupt action or improper resort to public officials. And there is no question but that the Greek officials whom plaintiff dealt with were aware of his agency, that they knew that he was the paid representative of the defendant for the purpose of negotiating a contract.

Defendant's contention, then, comes down to this: that the contract is bad because plaintiff was engaged to represent defendant before the Greek Government on the basis of his personal acquaintanceship with the Greek officials involved, which would have given him entree to circles where others might be barred. That alone is not enough to invalidate this contract under our law. In *Southard* v. *Boyd* (*supra*) plaintiffs were permitted to recover a commission that defendant had agreed to pay them for their services in effecting a charter of defendant's ship to the United States Government. To defendant's claim that the contract was against public policy in that plaintiffs had been hired because they had "influence" with the government agent in charge, the court replied as follows (51 N. Y. 179): "It is true that one of the plaintiffs was a son, and that another was a son-in-law of one of the government agents, whose business it was to select the vessels for the government, and the plaintiffs probably had facilities for chartering vessels which others did not have. But the plaintiffs did not contract to do an illegal service. They did not agree to use any corrupt means to procure the charter. The fact that the plaintiffs had intimate relations with the government agents, and

could probably therefore influence their action much more readily than others, did not forbid their employment. (*Lyon v. Mitchell*, 36 N. Y. 235.) '' It follows that the agreement upon which the British judgment is based does not offend our public policy.

On this branch of the case, defendant also contends that this court should not enforce a contract that has been held to contravene the public policy of Greece by a court of that country. Here again, however, defendant is met by the law of estoppel by judgment. This court is, as above indicated, bound by the determination of the British court in 1952 that '' the presumed intention of the parties is that this bargain shall be regulated by the law of England.'' That determination was based, *inter alia*, on the circumstances that the contract was made in London, that plaintiff was a British resident and defendant's representative an English subject, and that the parties probably contemplated that plaintiff would be paid in England in British pounds. If the contract is governed by English law, of course, there is no basis for refusing to enforce it merely because of its conflict with the laws of Greece. The judgment in the Greek action, as thus limited and construed by the British court, determines only that the contract, whatever its governing law, is unenforcible in the courts of Greece. It is obviously not inconsistent with this determination to enforce the agreement — by according recognition to the British judgment based thereon — in this court.

It remains only to treat of defendant's contention that the British judgment was obtained by fraud. The alleged fraud consists of the following: whereas in the British action plaintiff's allegations and testimony were to the effect that his services under the contract were based upon his acquaintanceship with officials of the Greek Government, in the Greek action, by contrast, plaintiff took the position that his services under the contract consisted principally of studying the contemplated project from an economic and engineering point of view, preparing complete details of the program, and making recommendations of the ways and means of executing the project successfully from an engineering standpoint. Defendant suggests that the change in plaintiff's position in the Greek proceeding resulted from his efforts to circumvent the Greek statute barring contracts with '' intermediaries ''.

Although, if true, this was certainly reprehensible behavior on plaintiff's part, I fail to see how it establishes that the British

judgment was procured by fraud. Under the law of New York, certainly, the facts alleged by defendant would not afford a basis for setting aside a judgment on the ground of fraud. (Cf. *Jacobowitz* v. *Herson,* 268 N. Y. 130, and *Crouse* v. *McVickar,* 207 N. Y. 213.) If these facts constitute grounds in England for setting aside a judgment because of fraud, it was incumbent upon defendant, in furtherance of its burden of '' satisfying the court * * * that he has a real defense to the action '' (*General Investment Co.* v. *Interborough R. T. Co.,* 235 N. Y. 133, 139), to offer proof of that law. This defendant has failed to do.

Moreover, it is fair to presume that if this defense had any real merit, defendant would have tendered it in the 1947 proceedings, along with the other defenses that it petitioned the Court of Appeal to permit to be interposed. All the facts upon which defendant now relies — the pleadings and testimony in the British and Greek actions — were then known.

In conclusion, none of the defenses interposed by defendant's answer afford a basis for denying recognition to the judgment of the High Court of Justice of Great Britain. It follows that there is similarly no merit to defendant's counterclaim. Plaintiff's motion for summary judgment on the complaint, therefore, is in all respects granted, and judgment is rendered for plaintiff dismissing the counterclaim.

Settle order.