139 A.2d 159 (1958)
Thomas J. BATA et al., Plaintiffs,
v.
Donald M. HILL et al., Defendants.
Court of Chancery of Delaware, New Castle.
February 14, 1958.
*161 Robert H. Richards, Jr., of Richards, Layton & Finger, Wilmington, Inzer B. Wyatt, Robert MacCrate and John W. Dickey of Sullivan & Cromwell, New York City, for plaintiffs.
George T. Coulson of Morris, Steel, Nichols & Arsht, Wilmington; Henry Cohen and Daniel M. Sandomire of Cohen & Sandomire, New York City, for defendants Donald M. Hill, Donald M. Hill, Jr.; Donald M. Hill and Donald M. Hill, Jr., as voting trustees; Jan A. Bata and North River Securities Corporation.
Henry A. Wise, Jr., of Wise & Suddard, Wilmington, for defendant Westhold Corp.
William Poole of Berl, Potter & Anderson, Wilmington, for Charles Jucker and Hans Berger, individually, as mandatories in accordance with the law of Switzerland, and as a partnership.
The other defendants have either not been served or not appeared.
SEITZ, Chancellor.
Basically, this is a dispute over the ownership of certain stock admittedly owned by Thomas Bata ("Thomas" or "testator") at his death on July 12, 1932. While there are several plaintiffs and defendants, it is agreed that the real dispute is between the plaintiffs, Thomas J. Bata ("Tom"), only son of the deceased and the executors of the Estate of his mother, Mary T. Bata, (who died February 27, 1954) on the one hand, and the defendant, Jan Bata, half-brother of Thomas, on the other. Reference to "plaintiffs" will embrace Tom and the Estate while reference to "defendant" will embrace only Jan unless otherwise indicated.
By this action plaintiffs and defendant both seek to be declared the beneficial owner of the following property:
1. 890 bearer shares of the capital stock of Leader, A. G., a Swiss corporation.
2. 280 bearer shares of the capital stock of Leader, A. G., a Swiss corporation.
3. 5,084 shares of the capital stock (being all the outstanding stock) of North River Securities Corporation, a Delaware corporation.
4. 2,200 shares of the capital stock (being all but 300 shares of such stock outstanding) of Westhold Corporation, a Delaware corporation.
No challenge to the court's jurisdiction to decide the issues is raised by any party. The Leader shares (Swiss holding company) *162 are bearer certificates which are physically within this court's custody[1]. The other property involved is stock of Delaware corporations which is evidenced by certificates on deposit with the court. The Delaware corporations were created long after Thomas' death. It is agreed however that their ownership will follow, derivatively, the determination of ownership with respect to the Leader shares. They will therefore be given only limited independent consideration in this opinion.
This litigation has a background of such magnitude that timely justice demands that the court restrain itself in painting the factual picture[2].
Thomas Bata, a resident of Czechoslovakia, died there in a plane crash on July 12, 1932. At that time he was admittedly the beneficial owner of the shares of the various companies throughout the world which constituted the Bata shoe manufacturing and selling enterprise. On the day of his death two documents written in his own handwriting were found in separate sealed envelopes in his safe. One purported to be a sales agreement dated May 10, 1931, by which Thomas sold all his stock in the various operating and holding companies to his half-brother, Jan Bata. The other, self-described as "My last will", dated May 19, 1931, purported principally to will to his widow, Mary, and only minor son, Tom, inter alia, the proceeds of the claim arising from a past sale to Jan.
Under Czech law, wills may be either "testaments" or "codicils". A "testament" names heirs (persons who are given all or fractional parts of the estate). A codicil contains legacies but does not name heirs. The will here is technically a "codicil" but will be referred to herein as a "testament" or "will".
Despite the fact that the purported sales agreement was dated May 10, 1931, it is conceded that Thomas continued to be the exclusive owner and chief of the business until his death on July 12, 1932.
It was decided in litigation in both New York and Holland and is here taken to be established that there was no valid inter vivos sale under Czech law. It is admitted that by the Czech court's deed of delivery, the heirs, Tom and Mary, took title to all of Thomas' estate subject to the obligation to pay debts and legacies. Thus, they took title to the Leader shares here involved. I pause to note that Czech law, prior to the Communist seizure, is controlling. Much of that law is found by reference to Austrian Civil Code provisions and court decisions because, of course, Czechoslovakia was part of the Austrian-Hungarian Empire until World War I.
Commencing at Thomas' death, Jan took over the management of the various operating businesses with the full cooperation of the heirs. The Bata Companies were making and selling shoes in large numbers. It was then a big business but was destined to expand much more in the years to come despite the loss of the assets beyond the Iron Curtain. It is disputed whether Jan took over as owner and whether he took over the Leader bearer certificates at all.
Thomas had caused Leader to be created in 1931 and transferred to it a majority of the shares of most of the operating companies. Two thousand Leader bearer shares *163 were issued. Four of these shares were held by Swiss mandatories as qualifying shares and the rest were ultimately held for Thomas by his trusted lieutenant, Muska. Thomas controlled Leader by virtue of what is known as a mandate relationship. Under the agreement covering this relationship, Thomas (mandator) gave instruction to certain Swiss lawyers (mandatories). Subject to Swiss law and the corporation's charter and by-laws, the mandatories were bound to follow such instructions with respect to the affairs of Leader.
The mandatories recognized Jan's right to give orders after Thomas' death and until the dispute broke out several years later between the heirs and Jan. Thereafter they were required to be neutral.
The operating companies continued under the control of Jan until he was compelled to withdraw by virtue of being placed on the British and American black lists during World War II. He then took up residence in Brazil and was not in the "general picture" for several years. Some time during this period, Tom, who was then in his early thirties, took control almost by "default" of nearly all the Bata enterprise beyond the German sphere of influence. Tom still controls the vast operation pending a determination of this litigation which involves ownership determination of the majority shares of the holding company, Leader.
The disagreement between Tom and perhaps his mother, Mary, on the one side and Jan on the other was "brewing" for some time and reached the breaking point in the middle forties. By that time it was apparent that a dispute had arisen as to whether Jan or the heirs owned the various shares of stock left by Thomas, particularly the stock of Leader.
The dispute produced the expected litigation in various places. Plaintiffs first commenced an action in Switzerland on March 28, 1947 to compel the Swiss mandatories to maintain the status quo until further order of the court. An order to this effect is still in force.
In an entirely independent action commenced in Switzerland on June 28, 1947, the heirs sought a declaratory judgment against the Swiss mandatories to have themselves declared entitled to be treated as Thomas' successors with respect to the mandate. Jan was interpleaded in the Swiss action and actively opposed plaintiffs' contentions. The trial court and the intermediate appellate court (decision final as to foreign law) have determined that the heirs are entitled in effect to operate as successors to Thomas with respect to the mandate relationship. The decision is discussed more fully later herein but it should be noted here that the decision is admittedly not entitled to binding force in this action.
The Leader shares (except perhaps for the four qualifying shares) were physically transferred at various times after Thomas' death. Muska, a trusted lieutenant of Thomas and later of Jan and the enterprise, died in the middle forties. Certificates for 826 Leader bearer shares were found in his safe deposit box in a bank in New York. The heirs immediately commenced a replevin action in the New York State Court against the Bank and Muska's administrators to obtain possession on the ground that they belonged to plaintiffs as the heirs of Thomas. Once again Jan was interpleaded and claimed ownership of the shares.
Before the New York action was completed, plaintiffs, on June 23, 1949, commenced an action in Holland to obtain possession of certain stock and dividends of the Dutch Bata Company. Once again Jan was a defendant claiming ownership.
In time the New York action was completed through the highest court and it was determined that plaintiffs were entitled to delivery of the Leader shares found in the New York bank. See Bata v. Chase Safe Deposit Co., Sup., 99 N.Y.S.2d 535; Bata v. Bata, 279 App.Div. 182, 108 N.Y.S.2d 659; 306 N.Y. 96, 115 N.E.2d 672. Basically, *164 as hereafter decided, the court concluded that there was no valid inter vivos agreement between Thomas and Jan and that consequently, Thomas died intestate as to the Leader shares there involved and the heirs were entitled to them; that they received them under the deed of delivery and continued to hold the shares as Thomas' intestate heirs. The court also decided that the heirs were not equitably estopped to claim the shares.
Before the New York litigation was concluded in the highest court of that State, the Dutch trial court determined the case on the merits. Despite the lower New York court's decision to the contrary, (which had been called to its attention) the Dutch Court concluded that the facts justified a conclusion that there was an inter vivos agreement between Thomas and Jan. It further concluded that even if there were no inter vivos agreement, the documents showed an intention on Thomas' part to create a "purchase legacy" in favor of Jan which, along with other facts, justified Jan's claim to the property there involved under a doctrine of Czech law known as acquisitive prescription.
Because of its importance to our case, I pause to discuss the "purchase legacy" concept upon which defendant places principal reliance in this action. It is conceded that it does not appear in any Code provision. While it may have been seldom used, I am satisfied that the Czech court would recognize a "purchase legacy", i. e., a will provision granting a specific entity the right to purchase an asset of an estate. It is also variously called a "legatum venditionis causa", "sales legacy" or "aufgriffsrecht". For convenience, I shall hereinafter refer to the concept as "sales legacy".
After the New York judgment became final and before the appeal to the Dutch intermediate court of appeal was determined, plaintiffs commenced this action in Delaware seeking delivery of stock of two Delaware corporations, one of which then held certificates for 890 bearer shares of Leader. Subsequently, certificates representing the 890 bearer shares plus 280 additional bearer shares of Leader were physically deposited with the court and are the subject of an ownership determination in this action. Thus majority ownership is here involved.
While this cause was being tried the Dutch Appellate Court concluded on the merits, without mentioning the New York determination which it had been asked to consider as a fact, that there was no inter vivos agreement. Thus, it reached the same conclusion as the New York court on this point. However, the court concluded that the two May 1931 documents created a sales legacy under Czech law which with other facts gave Jan the right to the Dutch shares and dividends under the doctrine of acquisitive prescription. Whether the sales legacy issue was ever decided by the New York court is a matter hereinafter considered.
The contentions of the parties in this action may be much more simply stated than resolved.
Plaintiffs first claim on the basis of the Full Faith and Credit Clause or the collateral estoppel doctrine that the New York judgment is conclusive of all issues here presented and requires a determination in plaintiffs' favor. Plaintiffs contend that even if the New York judgment is not conclusive on the present issues, plaintiffs are entitled to judgment in their favor on the merits.
Defendant concedes that there can be no determination by this court of the existence of an inter vivos transaction between Thomas and Jan. He claims that the New York judgment did not determine the sales legacy issue  the theory upon which the defendant principally relies here. Thus, he contends that with respect to the sales legacy issue here the New York judgment is not entitled either to Full Faith and Credit or collateral estoppel effect. In contrast, defendant argues that on the basis of collateral *165 estoppel this court must accept as binding the Dutch court's determination that the May 1931 papers created a sales legacy in Jan's favor which he accepted.
Defendant next contends that if the matter is to be viewed on its merits, Jan should nevertheless succeed because this court should find that the May 1931 documents, interpreted with the aid of extrinsic evidence, created a sales legacy in his favor, which was duly accepted by him. Alternatively, he argues, under the doctrine of constitutive recognition (later agreement by the heirs recognizing sales legacy) as announced under Czech law, Jan is entitled to be recognized as the owner of the stock here involved. Finally, Jan argues that even if the heirs were the owners they have lost the right to assert their ownership because of their tacit waiver or disclaimer.

New York Judgment
Since plaintiffs first contend in this action under various theories that a certain New York judgment in plaintiffs' favor in an action involving the same principal parties but different property constitutes a binding decision which this court must follow in disposing of the present litigation, I turn to that judgment.
Plaintiffs assert that the New York judgment must be given Full Faith and Credit effect here under the U. S. Constitution, art. 4, § 1. Under Delaware law the doctrines of res judicata and collateral estoppel require that the same effect be given a New York judgment rendered upon adequate jurisdiction as New York itself would accord such a judgment. Lewis v. Hanson, Del., 128 A.2d 819. See Iowa-Wisconsin Bridge Co. v. Phoenix Finance Corp., 2 Terry 527, 25 A.2d 383; Fryberger v. Consolidated Elec. & Gas Co., 22 Del.Ch. 357, 7 A.2d 211; Schuykill Fuel Corp. v. B. & C. Nieberg Realty, 250 N.Y. 304, 165 N.E. 456. This being so, if such principles are correctly applied to the facts of this case no violation of the Full Faith and Credit Clause and implementing statute can arise.
I therefore first consider whether under New York law the New York judgment in Bata v. Bata, above, is res judicata and thus a bar to a determination of this action on its merits. I say this because this court will only give such effect to the judgment of a sister state as that state would give its own judgment.
Parenthetically, in judicial usage in Delaware as elsewhere the term "res judicata" generally refers to the doctrine by which a court bars the same parties from relitigating the merits of the same cause of action. However in the "Restatement of Judgments" it has the broader usage of referring to all binding effects of former adjudications. Because the cases generally use the term "res judicata" to refer to situations where the same parties are precluded from relitigating the merits of the same cause of action I shall continue to employ the term in that sense.
As noted, a prior action between the same parties is a bar to the relitigation of the merits in a subsequent action under the res judicata doctrine only if it also involved the same cause of action. This is concededly the New York law in this field. See Schuykill Fuel Corp. v. B. & C. Nieberg Realty, above. It is further conceded that the New York action involved a determination of title to different property from that here in dispute. Consequently, under New York law the judgment did not involve the same cause of action as is present in this court. Thus, the judgment would not be res judicata in a second action in New York between the parties where different property was involved. Compare Schuykill Fuel Corp. v. Nieberg Realty, above. The res judicata doctrine is not then a bar to the determination of this action on its merits. Compare Lewis v. Hanson, above; 65 Harvard Law Review, 820, 833; and see Fryberger v. Consolidated Elec. & Gas, above.
*166 I might say that I agree with plaintiffs that the language of the New York Court of Appeals in the Bata case limiting its decision to the bearer certificates of stock there involved does not automatically preclude the application of the res judicata and collateral estoppel doctrines. Compare 2 Freeman on Judgments, § 670.
But plaintiffs contend that even though the causes of action be technically different the judgment in the first action is binding in the second as to all claims, whether litigated or not, where a contrary judgment in the second action would impair "rights and interests" established in the first action, citing Schuykill Fuel Corp. v. Nieberg Realty, above [250 N.Y 304, 165 N.E. 457]. Defendant denies that the Schuykill case doctrine has any application here.
Plaintiffs argue that the New York judgment established rights in the heirs to the property left by the testator because it was decided that the testator's property was not disposed of by any legacy in a will. Plaintiffs say that the decision thus established the status of plaintiffs as intestate heirs. They go on to point out that in such a situation the cases hold that in a later action, although involving different property, the status issue cannot be relitigated if the same transaction is involved.
First of all, I do not believe the situation confronting the New York Court in the Bata case involved a "status" issue of the type which is given conclusive subsequent effect in the New York cases. See e. g., In re Zeitz' Estate, 207 Misc. 22, 135 N.Y.S.2d 573. Such a holding would mean that nearly every determination could be said to establish a "status" and thus preclude subsequent litigation of "new" issues between the parties in a different cause of action.
The court in the Schuykill case made the following statement:
"* * * A judgment in one action is conclusive in a later one, not only as to any matters actually litigated therein, but also as to any that might have been so litigated, when the two causes of action have such a measure of identity that a different judgment in the second would destroy or impair rights or interests established by the first. Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195, Reich v. Cochran, supra [151 N.Y. 122, 45 N.E. 367, 37 L.R.A. 805]. It is not conclusive, however, to the same extent when the two causes of action are different, not in form only (Baltimore S. S. Co. v. Phillips, supra, page 321 of 274 U.S. [316] [47 S.Ct. 600, 71 L.Ed. 1069]), but in the rights and interests affected. The estoppel is limited in such circumstances to the point actually determined. Cromwell v. County of Sac, supra * * *."
Thus, the New York law only gives res judicata effect where the second action has such a measure of identity with the first that a different judgment in the second would impair or destroy rights or interests established in the first. However, the rule does not apply where the second cause of action affects different rights and interests. Certainly different rights and interests are here involved because we are dealing with a demand for different property. The decision here cannot affect the title to the property acquired under the New York judgment. Also we are dealing with a legacy claim whereas the prior action decided a contract claim. The validity of this distinction is recognized in the following language of the Supreme Court in Cromwell v. County of Sac, 94 U.S. 351, (cited with approval in the Schuykill case):
"It is not believed that there are any cases going to the extent that, because in the prior action a different question from that actually determined might have arisen and been litigated; therefore, such possible question is to be considered as excluded from consideration in a second action between *167 the same parties on a different demand, although loose remarks looking in that direction may be found in some opinions. On principle, a point not in litigation in one action cannot be received as conclusively settled in any subsequent action upon a different cause, because it might have been determined in the first action."
I decide that if this action were before the New York Court it would conclude that its prior decision in the Bata case did not preclude a determination of the sales legacy issue on its merits. It follows therefore that such decision is not binding here. Compare "Restatement of the Law of Judgments", § 70(b).
Plaintiffs next contend that under the doctrine of collateral estoppel the defendant is prevented from relitigating the sales legacy issue. Defendant denies that the sales legacy issue was ever decided in New York and thus denies the applicability of the doctrine.
Generally speaking, collateral estoppel may be defined as stated in "Restatement of the Law of Judgments", § 68(1):
"Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action, except as stated in §§ 69, 71 and 72." [the exceptions are not pertinent].
See also Iowa-Wisconsin Bridge Co. v. Phoenix Finance Co., above.
Preliminarily, plaintiffs tacitly concede that the present action is a "different cause of action" for purposes of applying the collateral estoppel doctrine.
Plaintiffs state that defendant's claim in the New York trial court was based primarily upon the existence of an oral inter vivos agreement of sale between the testator and defendant. They insist however that the sales legacy issue was raised and decided in the case on appeal and thus is binding here. Plaintiffs pick out numerous portions of the record on appeal in an attempt to show that the sales legacy issue was raised by defendant in New York. Assuming that the issue was raised on appeal, that does not dispose of the matter because the doctrine of collateral estoppel is applied only where the issue in question was actually determined in the initial action. This is the view taken by the New York courts. See Marine Transit Corp. v. Switzerland Gen. Insur. Co., 263 N.Y. 139, 188 N.E. 281. This is also the Delaware rule  Auerbach v. Cities Service Company, Del., 134 A.2d 846. The burden of showing that the issue in question was decided in the prior action is upon plaintiffs. See Bell v. Merrifield, 109 N.Y. 202, 16 N.E. 55; compare Venetsanos v. Pappas, 21 Del.Ch. 177, 184 A. 489. What are the facts?
Plaintiffs say that all matters of substance in the case at bar were litigated and determined in New York. They list at least ten matters so determined but I shall discuss only four because the others are so clearly only findings concerning evidentiary facts that they could not be binding in a subsequent action under the collateral estoppel doctrine. House v. Lockwood, 137 N.Y. 259, 33 N.E. 595; "Restatement of the Law of Judgments", § 68(p). The four important matters which the plaintiffs say the New York Court decided are as follows:
1. whether the two May 1931 papers gave any rights to Jan in the shares of stock left by Thomas Bata;
2. whether Thomas Bata died intestate as to all the shares of stock he owned at his death;
3. whether the two May 1931 papers contained any testamentary disposition in favor of Jan;
4. whether Thomas Bata intended the two May 1931 papers as a fiction.
The manner in which the issues are posed by plaintiffs makes it difficult to analyze *168 them. It is sufficient to say that for reasons hereafter given I do not believe the sales legacy issue was decided by the New York court.
Let us consider what the New York courts did decide. The trial court said, (Bata v. Chase, 99 N.Y.S.2d 535, 547):
"It is important, at the very outset, to understand the exact basis of Jan's claim to the 826 Leader shares. He does not claim that the document dated May 10, 1931, found in Thomas Bata's safe, in an envelope addressed to him, effected a sale to him of any of Thomas Bata's business properties or that it constituted a valid agreement to sell him those properties. Nor does he claim that the will of Thomas Bata bequeathed to him all Thomas Bata's business properties, on condition that he pay him 50,000,000 Kc. Jan admits that, at the time of Thomas Bata's death, title to all the business, including the shares of Leader, was still in Thomas Bata (in substance, if not technically). What Jan does claim is that in May, 1931, he and Thomas Bata entered into an oral contract by the terms of which he purchased all the business assets of Thomas Bata for 50,000,000 Kc; that this verbal contract remained unperformed at the time of Thomas Bata's death and was a charge upon the latter's estate, * * *"
Clearly the sales legacy or testamentary gift theory was not involved in the trial court.
I find the Appellate Division's conclusion in the following quotations: (Bata v. Bata, 108 N.Y.S.2d 659, 660-661)
"The so-called agreement of sale dated May 10, 1931, and the will of Thomas Bata dated May 19, 1931, appear to have been designed chiefly, as Mr. Justice Schreiber has said, for tax purposes. The alleged oral agreement between the two Bata brothers appears to have had the same motivation."
"* * * We hold that the trial court correctly penetrated the fiction which was erected, whether for tax purposes or otherwise, and determined rightly that title to these 826 shares of Leader A. G. passed to plaintiffs."
Certainly, this language is not a fair indication that the legacy theory was decided in the New York Appellate Division. I say this particularly because plaintiffs admittedly argued that the sales legacy issue was not properly raised for the first time on appeal, and it is not clear that the court rejected their contention. This is important because plaintiffs have the burden of showing that the issue was decided.
In any event, since there was an appeal to the highest court, it is vitally important to determine what the Court of Appeals decided. These are the important conclusions of that court (Bata v. Bata, 115 N.E. 2d 672):
"* * * Marie and Tom [plaintiffs] claim the shares as statutory heirs, or, in civil law, the `universal successors', of Thomas. Jan's [defendant] claim has varied. He first asserted an oral contract with Thomas, as to which the courts below have decided adversely to him, and we are of course bound by such findings. He then claims that by virtue of two documents  an alleged written contract dated May 10, 1931, and an alleged will dated May 19, 1931  as well as the subsequent conduct of plaintiffs, he is now the owner of said shares." At page 673.
"* * * and appellant concedes that the only real question here presented is whether or not there is evidence to sustain the unreversed Special Term findings, the findings made by the Appellate Division and the disposition based thereon." At page 673-674.
"* * * The Appellate Division also found that there had been no actual sale, oral or written." At page 675.

*169 "* * * Both lower courts have found that neither the May 10th writing nor the will constituted a valid, enforcible contract under Czech law." At page 677.
"Since the written contract of May 10, 1931, was held invalid by the courts below under the Czech law, the estate had no legal claim against Jan. And, although the holographic will was valid under Czech law, yet since it disposed of a non-existing asset only, Thomas Bata's estate devolved according to law to his widow and son by way of intestacy. It follows that, subject to the payment of debts and legacies, plaintiffs became the owners of Thomas's estate as a matter of law. The only remaining question is whether the Leader shares in suit were transferred to Jan by any acts of Marie and Tom thereafter." At page 677.
"Upon this record as it comes to us, Marie and Tom `had the better right' to the shares in suit (Clark v. Mosher, supra [107 N.Y. 118, 14 N.E. 96])." At page 678.
It is apparent from the quoted language that the New York Court of Appeals agreed that the testator did not contract either orally or in writing to sell his business property. While I believe defendant raised the sales legacy issue in the Court of Appeals, that issue was certainly not explicitly decided. But plaintiffs argue that the court decided that there was no testamentary disposition and thus there was a decision on the legacy theory. Plaintiffs say it is the substance of the claim and not the nomenclature which controls. I agree but this does not dispose of the matter.
As I read the Court of Appeals' opinion the case was finally and basically decided on the ground that no contract of sale was proved and plaintiffs were not estopped to claim the shares in question. Thus, the court said that "both lower courts find that neither the May 10th writing or the will constituted a valid, enforcible contract under Czech law". But the court did not consider whether either created a legacy as opposed to a contract of sale. A finding here that the will created a sales legacy in favor of defendant would not be inconsistent with the determination of the New York Court that no oral contract or confirmatory written contract existed. I believe that some direct mention of sales legacy or the substance of that contention would have appeared in the Court of Appeals' opinion had it been an issue which that court felt called upon to determine. The Dutch decision explicitly passing upon the sales legacy issue was admittedly submitted to the New York Court of Appeals by defendant. Yet it is not even mentioned in the opinion. Certainly there would have been some mention had the New York court felt that it was deciding the point to the contrary.
It is true that the court said that the will "disposed of a non-existing asset only". But assuming that the court did not consider the sales legacy issue properly before it, this conclusion necessarily followed from its decision that there was no contract of sale. The statement was a necessary premise to its conclusion that Tom and his mother took as intestate heirs. Had the court made the statement after considering whether the will contained a legacy to Jan, a different result would follow.
I conclude that the New York Court of Appeals did not determine the issue of sales legacy. It follows that the New York judgment forms no basis for here concluding that under the doctrine of collateral estoppel this court is foreclosed from considering the sales legacy issue on its merits.

Dutch Judgment
Since it would require this court to find, without considering the merits, that a sales legacy was created in Jan's favor, I turn next to defendant's contention that the Dutch court's finding of sales legacy must be given collateral estoppel effect in *170 this action. Preliminarily, it is not disputed that defendant has the burden of sustaining this affirmative defense.
Before considering the various contentions it will be helpful to state just what I believe the highest Dutch court decided in the Bata case here relied upon by defendant.
For our purposes we can say that the Dutch action was commenced by the present plaintiffs and defended by the present defendant. Plaintiffs there sought, inter alia, possession of certain shares of the Dutch Bata Company. The defendant also claimed title to such shares. The Dutch trial court found both an inter vivos sale and a sales legacy. The Court of Appeal in Holland concluded that while there was no inter vivos sale there was a sales legacy. Considering the sales legacy in conjunction with other facts it concluded that the property should be delivered to the defendant. The Supreme Court of the Netherlands  reviewing questions of law only  overruled plaintiffs' allegations of error. The Court of Appeal's finding on Czech law was a finding of fact.
To understand what was decided it is necessary to review the basic conclusions of the Court of Appeal because they were deemed to be decisive.
The Court of Appeal first ruled that under the "evidence" it was proved that Thomas Bata (testator) intended that the shares he owned should pass without reservation into the ownership of defendant (Par. 40). The all pervading ultimate influence of this finding is evident from the decision. The court decided that the evidence failed to support an oral purchase agreement between the testator and defendant. The court then ruled that the codicil (will) contained a sales legacy in favor of defendant (Par. 61) which he had accepted (Par. 69). Under civil law the court would then normally have been called upon to decide whether there was a legally valid transfer which would under the circumstances have resulted in "ownership" being in Jan. Instead, the court determined:
"* * * that in any case, regardless of the manner in which Jan Bata [defendant] obtained possession of the shares now at issue, he has since become owner of these shares in virtue of Para. 1466 A.B.G.B." (Par. 81 in Supreme Court opinion).
Paragraph 1466 of the Czech Code creates the doctrine known as acquisitive prescription. It provides as follows:
"He who has legal possession of a moveable thing for three years becomes the owner thereof by prescription."
Clearly the Dutch court did not declare Jan to be the owner of the Dutch stock on the ground that the will created a sales legacy in his favor which he had accepted and which had been legally transferred to him. Rather, under its acquisitive prescription determination the court used its sales legacy determination as the basis for finding that Jan had a legal claim or title, a necessary element in determining that acquisitive prescription was present. However, Jan also had to prove rightful possession under that doctrine.
Although their decision made it unnecessary to do so, the court went on to give its views as to certain other legal contentions. It is unnecessary to repeat them.
With this background I now consider the defendant's contention that since the sales legacy issue here involved was admittedly finally determined in defendant's favor by the Dutch court in an action between the same parties involving the same issue (effect of the May 1931 papers), although in connection with different property, this court must under the doctrine of collateral estoppel give binding effect to that determination.
Parenthetically, I shall assume without deciding that the Dutch court's determination *171 of "sales legacy" is an ultimate fact for purposes of applying the collateral estoppel doctrine. It will be noted that it was a finding used to fulfill the "legal claim" requirement for acquisitive prescription. Compare 2 Freeman on Judgments (5th edition), § 690; Bigelow on Estoppel (6th edition), Chap. III, § 3 at p. 176, et seq.
Plaintiffs contend that the Dutch determination is not entitled to binding recognition or respect as a finding that the May 1931 papers contained a sales legacy in favor of defendant for the following reasons:
I. The Dutch Court completely disregarded the prior New York judgment and Swiss decision. Certain other miscellaneous facts are also discussed under this head.
II. The Dutch judgment conflicts with the New York judgment which must be given priority and conclusive effect under the Full Faith and Credit Clause of the United States Constitution.
III. Even if the Dutch judgment were given recognition in this court, it should be given no greater effect in Delaware than it would have in Holland, where it would have no collateral estoppel effect as sales legacy.
IV. The Dutch judgment should not be given recognition as a matter of Delaware internal law because Holland gives no recognition to Delaware judgments. Rather, the Dutch determination should be examined in the light of the facts to see what effect, if any, should be given it.
I shall consider the contentions of plaintiffs in order.
I. The plaintiffs first argue that the Dutch courts disregarded the New York and Swiss determinations, both of which were before them. It is certainly true that except for some passing reference to the New York action in the decision of the Dutch trial court, the Dutch courts, at least insofar as their elaborate opinions are concerned, ignored the Swiss and New York determinations. From this fact as well as the general approach of the Dutch court, I infer that they did not give factual or legal weight to either. Was this of significance?
Plaintiffs do not appear to suggest that the Swiss trial court determination, which was before the Dutch court, was of prime importance in the Dutch action. I therefore do not consider the point further under this head of the argument.
Plaintiffs next assert, as is the case, that the conduct of litigation and of a trial in Holland is very different from that in the United States. But plaintiffs do not assert that it is so different as to preclude a fair trial and so I need not spell out and evaluate the Dutch procedure or consider this matter further except to note that both parties agree that the factual and legal presentations in Holland were not nearly so complete as here. Parenthetically, parties and their relatives are not heard in Holland as a matter of internal law.
Plaintiffs state that the Dutch Court of Appeal committed error in making findings concerning the applicable Czech law (true to some extent); that it did not have certain evidence before it (true also); and that it showed a determination to reach a result opposite to that arrived at in New York (not proved).
Plaintiffs point to what I find was an intemperate and unretracted attack by defendant's Dutch lawyer in the Dutch court upon the American courts, the New York trial judge and plaintiffs' American counsel (their New York counsel in this action).
Plaintiffs further correctly point out that defendant's lawyer argued to the New York Court of Appeals that the issues and record before the Dutch District Court and the New York Court were the same.
What do such of the foregoing facts as I have found to be true, prove in this case? Plaintiffs say they affect the credibility of one of defendant's Dutch witnesses and show inaccuracies in defendant's brief in *172 this court. But plaintiffs do not contend, at least under this head of their brief, that such facts alone or in combination should be the basis for denying collateral estoppel effect to the Dutch judgment if that principle is otherwise applicable. It is therefore not necessary to give further consideration to these facts under this aspect of plaintiffs' argument.
II. Plaintiffs' second reason why the Dutch judgment should not be recognized is that the Dutch judgment conflicts with the New York judgment which must be given conclusive effect under the Full Faith and Credit Clause.
Plaintiffs insist that in at least eight respects the Dutch judgment is in conflict with the New York judgment. I shall state and discuss plaintiffs' contentions separately.
1. Plaintiffs first point out that the language of the New York Court said that the will "disposed of a non-existing asset only". Whereas, according to the Dutch court the May 1931 documents contain a sales legacy in defendant's favor for all the shares of the testator. From this plaintiffs contend that the New York court decided that the will contained no legacy to defendant, while the Dutch court held to the contrary.
As I have already concluded in discussing the effect of the New York judgment, the New York court's language does not constitute a holding that there was no sales legacy. That issue was not decided by the New York court. It follows that the New York and Dutch judgments are not inconsistent on this issue.
2. Plaintiffs next say that the Dutch judgment is that the two May 1931 documents were drawn to evidence the purpose of Thomas "to place the ownership of the concern founded by and belonging to him, into Jan's hands without any reservation, after his (Thomas's) death". Whereas, the New York judgment was that the two documents were a fiction which was "designed * * * chiefly for tax purposes" (Appellate Division). The Dutch Court of Appeal specifically rejected plaintiffs' argument that evasion of death duties by fictitious acts was the purpose of the May 1931 documents (Par. 41).
Certainly the Dutch court rejected the contention that the May 1931 papers were designed to evade taxes. The New York court said the papers appear to have been designed chiefly for tax purposes. But the New York court did not state a conclusion which can be said to be absolutely contrary to the findings of the Dutch court. Moreover, the Dutch court's finding was in connection with "sales legacy" while the New York finding was made in resolving the issue of equitable estoppel. The best that can be said is that, while not necessarily inconsistent, the findings have an "aura" of incompatibility.
Thus, assuming without deciding that the facts are of a character which would warrant the application of the collateral estoppel doctrine, I must conclude that they are not clearly inconsistent and thus the New York judgment need not be accorded priority on that ground.
3. Plaintiffs contend that the Dutch judgment contains a finding that payment of the purchase sum was made by defendant, whereas the New York court decided that defendant never made payment of the purchase sum. The New York court made its determination on this point in connection with its disposition of the defense of equitable estoppel while the Dutch court made its findings in connection with the argument of plaintiffs that there had been no acceptance of the sales legacy.
The conclusions are inconsistent but they were not made or used in connection with the issue of the existence of a sales legacy and so do not directly touch the present collateral estoppel problem.
4. Plaintiffs say that the Dutch judgment determined that, in connection with *173 the estate proceedings in Czechoslovakia, the "declarations and acknowledgments" of plaintiffs in the June 22, 1933, "record" had "dispositive significance". The New York finding was that they could not form the basis of an equitable estoppel under the circumstances. Clearly the finding was used by the two courts to dispose of different issues. It is certainly true, however, that the courts gave different legal effect to the declarations made by plaintiffs in the estate proceedings.
5. Plaintiffs assert that the Dutch court incorrectly stated that the deed of delivery transferred to the heirs only the property therein listed, whereas the New York court held that under Czech law by such a deed all of the estate passes to the heirs subject to legacies and debts. Although the matter is cloudy, plaintiffs' contention appears to be true. Although its effect on the court's ultimate decision is a matter of speculation, I am inclined to think the Dutch court would have reached the same result even though it had recognized the correct Czech law on this point.
6. The Dutch and New York judgments certainly are in conflict as to the approximate value of the estate (Holland about $8,000,000; New York between $30,000,000 and $45,000,000). However, these findings do not appear to have been used in connection with the sales legacy finding.
7. The Dutch judgment is that defendant promptly claimed absolute ownership whereas in the New York decisions it is concluded that defendant made no such claim before 1939 because he did not treat the property as his own until after 1939. The courts appear to have arrived at different conclusions on this point. However, once again, the findings were made in connection with the determination of different issues.
8. The Dutch judgment was that defendant was in possession of the shares concerned under a claim of right whereas the New York court held that defendant never had possession of the shares concerned under a claim of right. Whether these holdings can be said to refer to the same property is not entirely clear and so I am unable to conclude that an inconsistency exists.
Thus, it appears that the New York and Dutch judgments reached inconsistent conclusions as to the following:
(1) Whether or not the purchase sum of the sales legacy was paid by defendant.
(2) Whether the June 22, 1933, declaration had dispositive significance.
(3) The effect of the Deed of Delivery under Czech law.
(4) The value of the testator's estate.
(5) Whether or not defendant claimed absolute ownership before 1939.
Defendant says these inconsistent issues are at best concerned only with "merely evidentiary or mediate facts" and under the doctrine of collateral estoppel are not binding in a subsequent action. Plaintiffs do not suggest that the New York "facts" identified above are entitled to collateral estoppel effect in Delaware. See "Restatement of the Law of Judgments", (1948 Supp.), § 68 (p); 142 A.L.R., p. 1243; 152 A.L.R., p. 1193. Consequently, since this court would not be bound by these evidentiary findings of the New York court under the doctrine of collateral estoppel there is no reason why this court should attach any decisive significance to the fact that the Dutch court did not give such findings conclusive effect. However, the Dutch court's action in some areas of factual difference is of some importance in deciding what effect should be given its sales legacy determination.
Before turning to plaintiffs' remaining contentions some preliminary discussion of the effect to be accorded foreign determinations is in order. There is apparently no treaty and there is no Federal law or Delaware statute touching upon the effect to be given foreign judgments or determinations *174 by the courts of Delaware. Nor do I believe the matter is governed by "national" law. The effect, if any, is therefore to be determined as a matter of state judicial decision.
The Delaware Supreme Court has said by way of dictum that foreign judgments are to be recognized, if at all, under principles of comity. See Iowa-Wisconsin Bridge v. Phoenix Finance, 2 Terry 527, 25 A.2d 383. This often criticized term merely means that Delaware is free to adopt whatever rule it desires with respect to the effect to be given foreign judgments. See 2 Beale, The Conflict of Laws, § 433.1; § 434.1.
I emphasize that the so-called res judicata as opposed to the collateral estoppel aspect of the matter is not before this court. It is important to note this fact because the American courts which have given binding effect to foreign judgments have generally been called upon to consider the matter in a res judicata context. For example, the leading American case on the doctrine of "reciprocity", Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95, dealt with an action in this country to enforce a French judgment.
III. Plaintiffs first contend and defendant tacitly agrees that before the Dutch determination of sales legacy can have collateral estoppel effect in Delaware it must be shown that Holland would give that effect to its own determination. This is a prerequisite to the application of the collateral estoppel doctrine even in connection with American judgments. Palmarito de Cauto Sugar Co. v. Warner, 225 App.Div. 261, 232 N.Y.S. 569.
Plaintiffs argue that in a later action in Holland between the same parties or their privities the Dutch court will consider its determination in an earlier action between the same parties binding if, in both actions, only the same issues are presented. Defendant says the Dutch doctrine applies to any material determination even though the later action also involves different issues. In view of my general approach to the recognition of Dutch determinations in a collateral estoppel context, I do not find it necessary to reach a conclusion with respect to this difficult point. I shall assume without deciding that defendant's version is correct and that in a later proceeding between these parties involving a different cause of action but the same transaction the Dutch court would consider its previous determination of "sales legacy" binding. Thus I shall assume that this prerequisite to the application of the collateral estoppel doctrine is present.
IV. Plaintiffs argue that determinations of foreign countries, at least those which do not give automatic effect to American (Delaware) rulings having collateral estoppel import, should be examined in each case to determine if, and to what extent, Delaware will give effect to them.
Defendant contends that Delaware should give collateral estoppel effect to the Dutch determination of sales legacy as though the determination had been made by a sister state. Defendant says that this should be done without regard to the effect which a Dutch court would give to a Delaware determination.
There is scant American authority dealing with our problem, which, I emphasize, involves collateral estoppel and not res judicata. The only mention of our problem of collateral estoppel in the foreign judgment field which I could find appears in a law review article by Professor Reese. "The Status In This Country of Judgments Rendered Abroad", 50 Col.L.R. 783, 789. He cites three cases in support of his statement that "* * * so far as appears, determination of a particular issue by the court of a foreign country will be held binding on the parties over here in any further litigation that may ensue between them". They are Newton v. Hunt, 59 Misc. 633, 112 N.Y.S. 573, modified on other grounds, 134 *175 App.Div. 325, 119 N.Y.S. 3, affirmed 201 N.Y. 599, 95 N.E. 1134 (appears to give collateral estoppel effect to English determination, although the discussion is limited); cf. Gould v. Gould, 235 N.Y. 14, 138 N.E. 490 (more nearly res judicata); and see Baiz v. Coro & L. V. R. Imp. Co., 87 N.J.Eq. 438, 101 A. 395 (not a true collateral estoppel situation). However, neither the author's work nor the cases cited by him contain any adequate discussion of this most challenging problem.
The Restatement of Conflict of Laws (§ 2 and § 450) would appear to give collateral estoppel effect to determinations of foreign countries. However, it has been suggested by high authority that there are compelling reasons for treating separately the rules governing interstate and international conflicts of law. See Ehrenzweig, Interstate and International Conflicts Law, 41 Minn.Law Rev., p. 717. Professor Reese shares this view. 41 Minn.Law Rev., p. 717, n. 4.
Of course the fact that these men feel that international conflicts (which would of course embrace the effect to be given in Delaware to foreign determinations) should be treated separately from interstate conflicts does not mean that the rules should necessarily be different. However, they indicate that the important factors may not be and in my opinion are not always the same.
I think it is important first to determine whether Delaware should give collateral estoppel effect to the Dutch determination of sales legacy without regard to the treatment which would be accorded Delaware determinations in Holland. In resolving this issue it may be helpful to consider the reasoning of the cases dealing with the applicability of res judicata to foreign judgments. With exceptions not here involved, most American courts and authors who have considered the problem have apparently approved the rule giving res judicata effect to foreign judgments without regard to the effect accorded such American judgments by the country whose judgment is sought to be enforced. See 50 C.J.S. Judgments, §§ 904, 906(a); 2 Beale, The Conflict of Laws, § 434.3. Gioe v. Westervelt, C.C., 116 F. 1017; Cowans v. Ticonderoga Pulp & Paper Co., 219 App.Div. 120, 219 N.Y.S. 284. The reasoning of these authorities varies. Some emphasize that there should be an end of litigation. Others say that the foreign judgment establishes an independent obligation. In England it is said that a foreign judgment, duly rendered, establishes an obligation which the courts of that country should enforce. See Berry v. Shead, 7 N.S.W.R. 39 (1889).
In contrast, a minority of American courts have adopted the view that foreign judgments are only prima facie evidence where used as a basis for action or defense in an American court.
The only Delaware expression of the effect to be given foreign judgments is found again by way of dictum in the 1842 Superior Court opinion in Pritchett v. Clark, 3 Har. 517, at pages 523-524, where the court, in dealing with a Pennsylvania judgment sought to be sued upon in Delaware, said:
"Independently of the constitution and laws of the United States, it is not disputed that the judgments of the several states would be regarded only in the light of foreign judgments by the tribunals of any other State; and would be, at most, only prima facie evidence of the debt or promise. The merits would be fully open to examination on a plea of the general issue, which would be nil debet or non-assumpsit, and not nul tiel record."
This view was also stated in the Chancellor's dissent (he later spoke for the majority) in the old Court of Errors and Appeals, 3 Har. 241, 259. It should be mentioned that the subject matter of the dictum in this old case was not a matter of dispute in the Superior Court or the upper court. This view that the foreign judgment *176 is at most only prima facie evidence is admittedly contrary to the majority American view and the view of one of the leading American authorities in the conflicts' field. See 2 Beale, The Conflict of Laws, § 434.3. The reasoning of the cases adopting the prima facie view is that it is an encroachment on state sovereignty to give binding effect to foreign judgments and that if they are to have such effect it should be a matter of international agreement.
I shall assume without deciding that the dictum of the Pritchett case (dealing with res judicata and not collateral estoppel) would not be adopted today as the Delaware law governing the effect to be given foreign judgments. Even so, can it be said that the reasons advanced for according res judicata effect to foreign judgments apply with equal force to the recognition to be given the determination of issues by a foreign court in a different cause of action between the parties (collateral estoppel)? Certainly, the desire to bring litigation to an end has merit. Compare Niles v. Niles, Del.Ch., 111 A.2d 697. But as Judge Learned Hand said by way of critical dictum in an American judgment context:
"* * * it [collateral estoppel] often works very harshly inexorably to make a fact decided in the first suit conclusively establish even a fact `ultimate' in the second [suit]". The Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 928, 152 A.L.R. 1187.
Indeed, the automatic recognition of foreign judgments often forces a most distasteful duty upon the court. Compare Gioe v. Westervelt, C.C., 116 F. 1017.
Since collateral estoppel is a judicially created rule designed primarily to expedite the administration of justice, it is obvious that where it need not be automatically applied, it should not be so applied when to do so would dignify form at the expense of substance.
It should be noted that an automatic application of the collateral estoppel doctrine to foreign judgments can result in according binding effect to one foreign court's determination although there is a later contrary determination by another foreign court. This can happen because collateral estoppel only applies where, as heretofore noted, the court rendering the first determination will itself thereafter give conclusive effect to its own determination. Some foreign courts give such effect (Holland we here assume), while others do not (Switzerland). Thus the binding effect is made to depend upon a factor having no bearing upon the relative merits of the two determinations. If it be said that this same possibility exists with respect to determinations of sister states, I answer that the probabilities are much greater in international situations. I say this because most of our states recognize collateral estoppel whereas most continental countries seem not to apply a similar doctrine. Compare Millar, The Premises of the Judgment As Res Judicata In Continental and Anglo-American Law, 39 Mich.Law Rev., p. 1.
In contrast to collateral estoppel, there is more reason to give res judicata effect to the judgment of a foreign country, because the foreign court, assuming it had jurisdiction of the type we would recognize, has rendered a decision with respect to a matter which is, by definition, the same as that involved in the second action. Thus, there is persuasive reason to give effect to the determination of a court of a foreign country where it clearly had jurisdiction (in the American sense) and where justice in that country was administered on what we would call a "civilized" basis. What about collateral estoppel?
It is no answer here to say that the plaintiffs selected the foreign forum. Plaintiffs had to bring the Dutch action or see the defendant obtain possession of 202 "new" shares plus dividends of the Dutch Bata Company. The property was located in Holland although neither plaintiffs nor defendant *177 was located there. The certificates and dividends involved were matters subject to the jurisdiction of the Dutch court and their rights thereto could only be finally established in Holland.
As in this case, the controlling law may not be the law of the country where the former action is commenced. Indeed, the findings as to foreign law by the Appeal Court were facts which could not be reviewed by the Supreme Court of the Netherlands. Moreover, a party may properly be held to be bound by the determination in particular litigation but it may be far from equitable to suggest that merely because he desires to assert a claim he may lose the benefit of other determinations in his own favor  a possibility under defendant's contention. Nor do the equities of the situation dictate that the matter should be resolved by a race to determine which court will decide the matter first. After all, the heirs filed the Swiss and New York actions before they filed the Dutch action.
The litigation history of the over-all controversy between these parties points up some of the inequitable consequences which might flow from an automatic application of the collateral estoppel doctrine to determinations of foreign countries. This is particularly true in the cases of countries which do not give similar effect to American judgments.
In the replevin action in New York between these parties over some of the Leader shares, the court determined that the May 1931 papers did not create an inter vivos contract. In a later Dutch action between the same parties involving different property of the Bata enterprise the New York determination was brought to the attention of the Dutch court for the purpose of treating it as an established fact in the Dutch action. However, it is a fair inference that the Dutch Court of Appeals refused to give the determination that effect, or indeed, any effect, even though the judgment was then final in New York. The Dutch court proceeded to evaluate and determine the inter vivos agreement issue on the merits.
It is true that the Dutch court concluded, as did the New York court, that the papers did not prove an inter vivos agreement. However, the vital point is that the Dutch court clearly felt free, had the facts in their opinion warranted it, to reach a determination contrary to that reached on the issue by the New York court. This was an implied rejection of any theory of collateral estoppel. Had the Dutch court reached a different conclusion (as the trial court in fact did), would it have served the cause of justice and equity for another American court, in a later action, to give collateral estoppel effect to the Dutch determination on that issue? I think not, and this is said without regard to any Full Faith and Credit implications.
Defendant points out that where the same issue is decided by two courts, the later decision will be given effect. He says this applies to foreign judgments as well as domestic judgments citing Ambatielos v. Foundation Co., 203 Misc. 470, 116 N.Y.S. 2d 641. It will be noted that the Ambatielos case involved res judicata and not collateral estoppel. Since I have ruled that the "sales legacy" issue was decided in Holland but not in New York the priority issue is not directly presented.
I should note that the contention covering the priority of the later declaration has more persuasiveness in the domestic judgment field. However, it has many inherent deficiencies when sought to be applied to the collateral estoppel aspect of foreign determinations. I can fully understand why the later of two determinations is binding when it is made by another American state. I say this because the second court presumably has decided the matter with due regard to the Full Faith and Credit Clause of our Constitution which requires it to give collateral estoppel effect to a judgment of a sister state, if the sister state gives such effect to its own determinations. This protection is not afforded a *178 litigant where the later judgment is rendered by a foreign country which is not obligated to give collateral estoppel effect to a judgment of an American state. Nor is there any court which can make it do so. It is not a conclusive answer to say that perhaps in that situation the court would give preference to the domestic determination.
This court recognizes that mere provincialism should not be the basis for formulating a rule fixing the effect to be given determinations of issues by foreign courts. However, the court also recognizes that, without regard to the nationality of a litigant, his rights in an American court should not be circumscribed by the automatic application of conclusions reached by foreign courts without regard to the circumstances. It might be added that this is even more true where that foreign court is not even applying its own substantive law and is determining the issue collaterally.
I therefore conclude that Delaware will not give automatic collateral estoppel effect to the sales legacy determination of the Dutch court but will examine the circumstances to see if and to what extent, it will give effect to such determination by the Dutch court. However, plaintiffs seem to concede that binding effect should be given the Dutch sales legacy determination here, if Holland would give similar effect to a Delaware determination  the so-called reciprocity rule. I shall rule on the reciprocity point but in doing so I shall assume without deciding that collateral estoppel will be applied if Holland would give "automatic" recognition to a Delaware determination, i. e., apply the same tests.
Does Holland give collateral estoppel effect in its court to foreign determinations in the same way our American courts do with respect to determinations by other American courts?
Plaintiffs say that the Dutch court is free as a matter of Dutch law to decide in each particular case whether or not it will give binding effect to a foreign judgment. Defendant argues that plaintiffs have not sustained the burden of showing "that the Dutch law does not permit reciprocal effect to Delaware judgments". Let us see what the Dutch cases have decided.
The Supreme Court of Holland held in the so-called Fur Coat Case (Nov. 14, 1924, PT-1342)[3] that Section 1954 of their Code does not apply to foreign judgments. Thus, there is admittedly no Code provision applicable to the problem. The court also said, "* * * that the effect of res judicata does not apply in the Netherlands to a foreign judgment * * *". The court went on to approve the rule "that the Netherlands courts must examine in each individual case whether and to what extent they are to accord authority to a foreign judgment * * *". The court announced a judicially created rule to fit that case, saying:
"* * * since, it having been established that the appellants [a Dutch partnership in liquidation] quite voluntarily sought judgment from an English court and were bound thereby in good faith and equity, it must be held, in agreement with the Court of Appeal, that the Netherlands courts must only set aside such a judgment if it conflicts with the Netherlands principles of public policy, of which there has been no evidence in this case;"
In the Hungarian Mortgage Case the Supreme Court of Holland adopted what is now the law of Holland:
"* * * none of the statutory provisions cited prevents the authority of a Netherlands court to judge in each particular case under due regard of Netherlands principles of public order, *179 whether and in how far authority should be accorded by it to a foreign decision;" (June 24, 1932, D-1861).
The New York Separation Decree case decided by the District Court of the Hague, December 21, 1949, (D-1862) can be said to stand for the fact that the court there gave collateral estoppel effect to a foreign determination. Apparently that case was not appealed.
Later in the so-called Younger Swiss Child case, the Supreme Court of Holland, (April 1, 1938, PT-1430) stated that Section 431 of the Code of Civil Procedure which, with exceptions not relevant, prohibit the enforcement[4] in Holland of foreign judgments, is inconsistent with any obligation on the Dutch court to give automatic effect to foreign judgments. The court said, however, that the Section, "* * * does not rule out the competence of the Netherlands courts to examine in each individual case, whilst respecting the principles of Netherlands public policy, whether and to what extent they should accord authority to a foreign judgment, * * *". Of course, defendant here does not seek to enforce the Dutch judgment but he does seek binding effect for it to the extent it determined that a "sales legacy" was created by the testator. In this connection it is important to emphasize that the Dutch court said in the Younger Swiss Child case that the same Code provision was "incompatible with any obligation * * * to pronounce judgment because the foreign court has done so or to base their judgment on certain facts solely because the foreign court has held those facts to be correct in its judgment".
Based upon the evidence adduced I conclude that under Dutch law the Dutch courts are not bound in law to give binding effect in whole or in part to a foreign judgment. I speak, of course of a rule of automatic application comparable to our collateral estoppel rule.
In view of the foregoing decisions the defendant concedes that Holland does not have a code rule of res judicata or collateral estoppel applicable to foreign judgments. He argues, however, that under a judicially created rule Holland will give binding effect to a foreign judgment under some circumstances and that plaintiffs have failed to sustain their burden of showing that under Dutch law binding effect would not be given to a Delaware determination, citing Kessler v. Armstrong Cork, 2 Cir., 158 F. 744 (there was no offer in this case to prove the foreign law concerning foreign judgments); Gull v. Constam, D.C., 105 F.Supp. 107 (held that absence of reciprocity must be pleaded by one relying upon it).
Plaintiffs contend that their showing that foreign determinations are not automatically recognized in Holland is sufficient to prevent any finding of reciprocity of the type sufficient to justify this court in automatically giving collateral estoppel effect to the Dutch determination.
I conclude that Holland would after reviewing each case grant conclusive effect to some Delaware determinations. Compare The Hungarian Mortgage Case (June 24, 1932, D-1861) and the New York Separation Decree Case, (December 21, 1949, D-1862). It is also true that a leading Dutch legal writer has stated that binding effect will be given foreign judgments in his opinion unless they violate the Netherlands public order (D-1863). But the area of judicial discretion is not so explicitly defined by the Dutch courts that one could say with assurance what would come within the Dutch court's concept of "public order". It is thus akin to our nebulous term "public policy". See DuBois, The Significance In Conflict of Laws of the Distinction Between Interstate and International Transactions, 17 Minn.Law Rev., pp. 361, 378. Moreover the Dutch court's verbal formulation of its rule in the Younger Swiss Child case (PT-1430), as hereinbefore quoted *180 suggests very strongly that Netherlands public policy is not the only limitation upon the recognition to be accorded foreign judgments. It will be noted that its recognition must perhaps be preceded by a determination that the proceedings leading up to the judgment were in keeping with the Dutch court's notion of justice. See The Hungarian Mortgage case, above. And this idea seems broader than our "due process" concept.
The effect to be given a foreign judgment by the Dutch court thus appears to be a matter of discretion with the court and it was presumably on this basis that the Dutch court ignored the New York Bata decision in determining whether or not an inter vivos agreement existed. Where the recognition of a foreign decision is in the area of court discretion, it is difficult to apply the principle of collateral estoppel.
I conclude that under Dutch law the Dutch courts are not bound as a matter of law to give binding recognition to foreign judgments or foreign determinations of issues in an area equivalent to our own application of the doctrine. Rather, under judicially created principles, the recognition to be given is found in the exercise of judicial discretion. This appears to include a determination that the proceeding leading to the judgment was in keeping with the Dutch court's notion of justice. See The Hungarian Mortgage case, above.
But is collateral estoppel effect to be accorded the Dutch determination merely because Holland may after reviewing the facts give binding effect to some Delaware judgments? I think not.
If the reciprocity doctrine is to apply in a practical way, particularly in the collateral estoppel field, it is obvious that the foreign court involved cannot be free as a matter of law to "pick and choose" which foreign judgments will be accorded binding effect based upon nonjurisdictional considerations.
Defendant argues that plaintiffs failed to sustain their burden of establishing the "absence of reciprocity in the foreign law". Defendant does not spell out precisely what he would require plaintiffs to show here. I gather he contends that plaintiffs must show a negative, but what that negative would involve is not made entirely clear. In any event, plaintiffs were not required to prove that reciprocity would not be accorded in any case. I say this because "reciprocity", as I understand it, assumes that, subject to limitations inherent in the recognition of all foreign judgments, a Delaware determination would automatically be given binding recognition in Holland and the Dutch court would not be permitted, as it now is, to determine "whether and in how far authority should be accorded by it [Dutch court] to a foreign decision". The Hungarian Mortgage case, above.
I therefore conclude that to the extent plaintiffs have any burden, they have sustained it by showing that the Dutch court would not automatically (subject to jurisdictional and related limitations) accord binding effect to Delaware determinations.
I further conclude, for the reasons given above, that the principle here announced should apply in the collateral estoppel field even though, as here, the plaintiffs (both here and in Holland) are not United States citizens, and although they were also plaintiffs in the Dutch actions. It follows that even if the reciprocity test be controlling, the Dutch determination of sales legacy should be given no greater weight in this action than the Dutch court would grant to a Delaware determination, viz., evaluate it in the light of the circumstances to see what effect, if any, should be given it. That approach will be adopted here.
One pertinent circumstance is the determination of the Swiss intermediate appellate court which I now consider.
*181 Plaintiffs do not claim binding effect for the determination of the Swiss Superior Court (final appellate court on questions of fact) because they concede that it would not be a binding sales legacy determination in a later action between the parties in Switzerland to determine ownership. However, they say it is of great persuasive weight particularly because defendant relied upon Swiss authority to support his sales legacy argument and because it involved the very situation which is before this court.
The Swiss declaratory judgment action was brought by the heirs against the Swiss mandatories asking, inter alia, that they be directed to recognize the right of the heirs to give orders to them as successors to Thomas in the mandate relationship. Jan was permitted to intervene and he did so and took over the defense of the action. Under Swiss law applicable to the form of action involved, Jan could not assert his own claim to ownership affirmatively but he could do so negatively in the sense that he could and did say that plaintiffs had no standing to sue because the mandator aspect of the mandate relationship passed to him pursuant, inter alia, to a sales legacy left by Thomas.
I find that the Appellate Court of Switzerland, by entering judgment for plaintiffs, necessarily rejected defendant's argument that plaintiffs had no standing to sue because he (Jan) had, by a sales legacy from Jan, become the successor mandator. The court announced its decision but has not yet filed its promised opinion. This court can no longer defer its decision on that ground. While defendant can, by further appeal, attack the decision to the extent it is based on Swiss law, the intermediate appellate court's determination of the Czech law applicable to the sales legacy claim cannot be further appealed. Of course, if certain of the Swiss law points were reversed (e.g., whether the mandate relationship survived Thomas' death), it might be argued that the sales legacy ruling by the intermediate appellate court was legally unnecessary. However, I do not consider this too important because plaintiffs do not seek binding effect for the Swiss determination on "sales legacy" but only say that it is entitled to persuasive weight for the reasons given.
Thus the decision shows that a court with a legal system having some common ancestry with the Czech system has rejected the claim of sales legacy in this same general situation.
In the light of the Swiss decision and the other circumstances of this case, should this court in the exercise of discretion give binding effect to the Dutch determination of sales legacy? I think not for the following reasons:
1. The Swiss Appellate Court, applying Czech law, reached a conclusion with respect to sales legacy which is contrary to that reached by the Dutch Court, although it had the final Dutch decision before it.
Defendant contends in this case that Swiss law is of some persuasive importance in determining Czech law because of the background similarity of the two legal systems. Indeed, defendant placed great reliance on one Swiss case (Froelich v. Froelich, D-1808). In contrast, it is conceded that Dutch law does not have a similar relationship to Czech law. Consequently, adopting defendant's contention as to Swiss law, it follows that the action of the Swiss judges can be said to be based on a greater "feeling" for the controlling Czech law in the same general situation which is presented to this court. I say this fully realizing that the Swiss court's determination is not entitled to collateral estoppel effect here.
2. The Dutch Appellate Court ignored the New York decision and made important contrary findings of fact which "flavored" its decision. True, they were not "facts" entitled to collateral estoppel effect but they were important. However, the fact that they were ignored or rejected in their *182 entirety tends to be a negative factor in deciding whether the Dutch determination should be accepted without consideration of the merits. After all, the New York trial came first and the record made was much more elaborate.
One finding of the Dutch court deserves particular notice because of the importance of the fact in this court's thinking. The Dutch Court found in effect that the value of the assets (about $8,000,000) was not out of keeping with the purchase price fixed by Thomas in the May 1931 papers (Par. 112). If this were true, and not even defendant contends here that it was, it is hard to understand why Thomas did not see fit to make a direct sales legacy to Jan if he so intended. After all, even under Jan's theory avoidance of estate taxes was a very real reason why he allegedly "disguised" the legacy to Jan. The tax rate to the half-brother, as opposed to that applicable to the son and widow, was not so much higher that it would be a sufficient explanation. Nor was the concealment of some aspects of his foreign assets alone a sufficient "reason" for the use of a disguise. Yet the Dutch Court found no occasion to consider what appears to this court to be an inconsistency in its opinion which is bound to be important in any evaluation of the case.
3. Some of the important principles of Czech law were not considered in the Dutch decision. I do not suggest this as a reflection on the Dutch court. I say this because it is conceded by both sides that the presentation of Czech law both in Switzerland and Holland was not nearly so exhaustive as in this court.
4. Admittedly the case on its merits was much more fully presented in this court than in either Switzerland or Holland.
Although not an independent reason, I should also note that the unwarranted (and in my opinion, unretracted) attack by defendant's Dutch counsel upon the American legal system, etc., in an attempt to discredit the New York judgment does not commend the defendant's appeal that the Dutch determination be given binding effect. I emphasize that this is not intended as a reflection on the Dutch court.
The court is aware that the reasons given above for not according conclusive effect to the Dutch determination would not be legally sufficient were the collateral estoppel doctrine applicable. But they are sufficient where, as I have found, I am free to examine the Dutch proceedings to see what effect, if any, I believe should be given them.
Having determined that the Dutch court's sales legacy determination should not be given binding effect, I now turn to the merits of the controversy.

The Merits
Plaintiffs' argument on the merits goes like this: The property here involved was owned by Thomas Bata at his death or derived from property so owned; there was no inter vivos sale of the shares to Jan; under Czech legal proceedings (deed of delivery) the heirs became vested with title to all assets of the estate subject to a duty to pay debts and legacies; there was no sales legacy to Jan of the shares and the plaintiffs have not lost their right to assert their intestate ownership because of any events after Thomas' death. Thus, plaintiffs are entitled to the property in dispute.
Defendant concedes that it must be assumed here that there was no inter vivos sale and that title to the shares passed to the heirs subject to a duty to pay debts and legacies. However, he claims that the May 1931 documents considered in connection with the surrounding circumstances show an intention on Thomas' part to create a sales legacy in favor of Jan and that Jan accepted the legacy; that, in any event, on the basis of the Czech law doctrine of constitutive recognition Jan is entitled to be declared the owner of the property here involved; finally, that under the Czech law *183 of tacit waiver or disclaimer plaintiffs are not entitled to assert their ownership. Thus, defendant is entitled to the property.
I turn first to the issue of sales legacy. I recognize that the ascertainment of the testator's intent is the objective and that the Czech "substantive" law in 1932 is controlling.
A preliminary dispute arises as to what evidence outside the will may be considered in interpreting the will. Plaintiffs say the Delaware rules of evidence control while the defendant claims that the court should consider all matters which the Czech court would have considered pertinent  a much broader rule since Czechoslovakia did not have so-called rules of admissibility. I need not decide this point in connection with the determination of the issue as to whether the May 1931 papers, when considered with extrinsic evidence, created a sales legacy in defendant's favor. This is so because I have concluded that the matter must be decided here solely by the application of a principle of Czech law to the language of the last will itself. Of course, the facts of which Thomas may be deemed to have been aware are relevant by either Czech or Delaware standards and they are important background in considering the dispute. With some duplication, I now refer to the more important facts.
Thomas was born in 1876 in Moravia, then part of the Austrian-Hungarian Empire. Later it was part of Czechoslovakia. Thomas Bata's family had been shoemakers for generations. Thomas Bata, Sr., was born of his father's first marriage. His father remarried and the defendant, Jan, who was born in 1898, was one of four children by the second marriage. Thus, Thomas and Jan were half brothers with Thomas many years his senior. About 1894, Thomas and his brother and sister by his father's first marriage commenced a partnership shoe business at Zlin (later part of Czechoslovakia). However, by 1908 Thomas had become the sole owner of the business.
Thomas married Mary Mencik in 1912 when she was 19 years of age. Mary had gone to a "Lyceum" in Vienna but had no business training. Plaintiff, Tom, was born in 1914 and was the only child of the marriage. Jan, who went to live with Thomas in 1909, continued to live there after the marriage and until he went to the United States in 1919.
In early 1918 Thomas developed a thrombosis in his leg. This was a matter of serious concern. At that time Thomas made a will dated January 29, 1918. It was accompanied by a medical certificate as to his mental and his nervous condition but not as to his physical condition. This long will had nine supplements, and its significance will be considered under another issue herein.
During the twenties and early thirties Thomas was expanding the business beyond Moravia. However, he had a highly personal but slipshod method of handling the finances of the foreign companies and their transactions with the company at Zlin. It was in 1919 that Dominik Cipera, who married Thomas' niece, became associated with Thomas in the business. Cipera was to become Thomas' "right hand" man.
Thomas took a great personal interest in young Tom's education and activities, and required that he be trained in the business from the bottom up. There is no doubt about the great affection that Thomas had for his son.
During all these years Thomas' wife, Mary, who knew nothing of commercial or financial affairs, was engaged in social welfare projects and entertaining for her husband. All of her expenses were handled through the factory at Zlin. I have no doubt that Thomas was deeply devoted to his wife.
In the years prior to 1931, Thomas relied heavily upon his relatives to assist him in the administration of the business both in and outside of what became Czechoslovakia. Thomas had permitted a very complicated *184 system to evolve by which profits of the foreign countries were carried in a way that made it difficult for others to know of his holdings. Large sums of money, presumably profits of foreign operations, were carried under various titles in foreign banks and were called the "Export Department" of Bata Shoe and Leather Company, Lynn. Actually, this money had no connection with the Lynn Company (an American corporation). It appears to have been used in part as a device to avoid paying Czech taxes on some foreign profits. In time Cipera came to keep the records in connection with these substantial balances.
There is no doubt that in 1931 and 1932 the Bata business was sizeable and that Thomas had plans for even greater expansion. Thomas caused the Swiss company known as Leader, A. G. to be organized. This corporation was formed on February 5, 1931, and had an authorized capital of 2,000 bearer shares. Whether delivered to him directly or not, it is agreed that Thomas was the personal owner of all of these shares. Actually, except for four qualifying shares, the shares were either delivered to Thomas personally or to the Dutch Bata Company, which he controlled. The Leader transaction was "covered up" by a fictitious pledge agreement which made it appear that the Swiss lawyers were the actual stockholders while Thomas and the Dutch Bata Company were pledgees with the right to take title at any time.
Plaintiffs state that Leader was formed for tax reasons. They say it was not done from any desire of Thomas to conceal his ownership of foreign companies, as defendant argues. I think Thomas had both considerations in mind when he caused Leader to be created. An additional reason was that Switzerland was somewhat of a financial asylum in the midst of the political and economic turmoil which characterized most European countries.
By 1931 the value of Thomas' assets at home and abroad amounted to somewhere between 1,000,000,000 K. C. and 1,500,000,000 K. C. (from 30 million to 45 million dollars). At this same time his liabilities were negligible. Defendant does not challenge the value as here stated. While the value may have been less at Thomas' death, I do not believe it was so reduced as to bring the value in line with the amount of the "sale" price fixed by Thomas.
It was about this same time that Thomas incorporated the Czech company known as Bata, a. s. This company was located at Zlin, Czechoslovakia and employed thousands of workers. It was in or near Zlin that Thomas and the present parties lived.
Thomas Bata died in a plane accident July 12, 1932, when he was about 56 years of age. I find that at the time he was in good health and expected to continue in the business. At that time he was happily married to Mary, a woman of grace and talent but of no business experience. At the time of his father's death Tom was 17 years of age and was working for Bata in Switzerland. His father was quite obviously grooming him for leadership and indeed defendant himself so recognizes.
At the time of Thomas' death the defendant was about 34 years of age. He had been in the business for a good many years and was quite familiar with its workings and he could be said to be one of Thomas' trusted lieutenants. However, he did not "rank" some other lieutenants. The relationship between Thomas and Jan was friendly but I do not believe it compared with that which existed between Thomas and his son and wife.
When Thomas died the only key to his safe was on his person. After the key was obtained the safe was opened on the day of his death in the presence of Jan and several other trusted lieutenants of Thomas (young Tom was then in Switzerland and, of course, Mary was not present). They found a sealed envelope addressed to Jan in Thomas' handwriting. Jan opened it and found it was a memorandum of sale dated May 10, 1931. It was written entirely in *185 Thomas' handwriting and it was signed by him twice. It consisted of two pages.
Some of those present read the document and signed their names. One of the lieutenants (Cipera) wrote on it, in ink, "in our presence on 7/12/32 opened by J. A. Bata". Apparently at the suggestion of one of those present, Jan at that time wrote on the document, "I agree and purchase, Jan A. Bata". On the next day Jan added the words, "That is to say, I agreed and purchased as per oral agreement". Although there may be some dispute about them, I find the foregoing to be the facts. When the "7/13/32" date was added by Jan I do not consider of importance under my approach.
The translated document, as it looked after the actions above described, appears as follows:

 "I, the undersigned Tomas Bata sell
to you J. A. Bata and you purchase
from me all shares of Bata akc. spol.
Zlin as well as all shares of the construction
company "Zlin" then all shares of the
company "Tisk" then participations in the
Libstat establishments.
"Of foreign companies I sell to you
the following shares or participations:
Company, Bata Schuh Aktiengesellschaft
Zurich nominal value frc. 450,000. 
Bata Matschapai Amsterdam 51,000 Hol. fl.
Bave " " 20,000 Hol. fl.
Bata Cipele i koze Zagreb 2100,000 Dinars
Bata Krakov 100,000 Zl.
Bata Bukarest 2000,000 Lei
Bata Alexandria 2,250 £
Bata Copenhagen 400,000 D. Kr
Bata Strasbourg 600,000 Frc

*186 From the sold property is further excluded the debt which we have against the city in the amount of approx. 4300,000 that is by such amount the purchase price is increased and J.A. Bata is under obligation to pay such amount to the city of Zlin. (signed) Tomas Bata

 [second page]
Bata Stockholm 40,000. Kr
Bata Deutsche Schuhe A. G. Berlin 110,000 Rm.
Bata Vienna 20,000 S.
Bata Shoe & Leather Lynn 15,000 $
Bata " New York 400,000 $
 I sell to you shares
Further also of domestic companies
Bapoz spol. s. r. o. 400,000 Kc
Paris akc. spol 500,000 Kc
Atlas insur. 3,000,000 Kc
Busi Trebic 10,000,000 Kc
Budisovsky Trebic 10,800,000 Kc
"From these values I exclude is excluded the landed property
Loucka a Lazy as well as my residental house
in Zlin
"Besides these enumerated values included
are in the sale I sell to you all
ym my property even if it is not enumerated
here for the amount of Kc 50,000,000 fifty
million K.c. Czechoslovak currency.
"You are under obligation to pay this purchase price in cash
within one year from taking over the companies and
to pay 5% interest pro ano
"7/13,32 note:
"I agree and purchase; (signed) J.A. Bata (signed) Tomas Bata that
is to say, I agreed and purchased as per oral agreement.

*187 A second sealed envelope was also found which had written on it in Thomas' handwriting "My last will". It was opened the following day at the official ceremony and purported to be a will in Thomas' handwriting dated May 19, 1931, consisting of two pages. A true translated copy follows:

 [first page]
 S1 25/32
 --------
 "1
 "My last will:
"Made on the day 19/5 1931
"My property as of today
 consists of
 "Claim against J. A. Bata
 of
for all shares sold xx
domestic and foreign comp. Kc 50,000,000
My dwelling house in Zlin 100,000
Landed estates Loucka and Lazy and Schmergerle 3,000,000
Claim against the City of Zlin  About 4,300,000
 __________
 57,400,000
 ----------
"From this my property I bequeath
"To my wife Mrs. Marie Bata
 Landed estates Loucka Lazy Schmergerle  3,100,000
"Further in cash  Kc 5,000,000
"To my son Tom Bata his legal
 quota Kc 22,000,000
 with the provision that this his
 property shall be administered by his mother
 until he reaches 22 years of age.
 The proceeds shall be used for his education
 and the remainder shall be deposited for his benefit.
 __________
 30,100,000

*188
 [second page]
 "Carried forward 30,100,000
"To my sister Anna Schiebel I bequeath 1,500,000
"To the City of Zlin the debt 4,300,000
 with Bata a.s. J.A. Bata will pay
"The balance  Kc 21,500,000
 ___________
 57,400,000
"I give to my fellow workers
 is to be paid
 is payable within 5 years with 5% interest
"This amount is to be paid in cash
 to the Bata Workers Benevolent Fund and is to be
 administered in the spirit of the now effective
 by-laws.
 "It is understood that I have drawn up
 this last will with full understanding
 being of sound mind and without duress
 and in my own handwriting.
 "/s/ Tomas Bata
 "My previous testament hereby
 naturally loses its validity.
 "/s/ Tomas Bata
 "Published at the District Court in Zlin
 on the 13th day of July 1932.
"[Seal of
 the District Court
 in Zlin]
 "/s/ Loucka Bohumil"

For convenience, I shall refer to the May 10 paper as the "sales agreement" and I shall refer to the May 19, 1931, paper as the "will". I shall refer to them collectively as the "May 1931 papers".
Plaintiffs suggest that the evidence does not show precisely when the May 1931 papers were written. This is to some extent true but in and of itself it is not of decisive importance. However, I think a reasonable inference from the evidence would be that they were written in the early part of 1931.
Plaintiffs also suggest that the May documents were merely drafts. They point out that shortly after the date of the May 19, 1931 will Thomas transferred his personal residence property and also later transferred *189 other properties to Bata, a. s., although, in his will, he had left them to his wife. Also one company was listed which had been liquidated and others were omitted which were in existence. From these and other actions plaintiffs conclude that Thomas never intended to make the May 1931 papers effective.
Defendant does not dispute the foregoing facts but says they are immaterial. I do not agree that they are immaterial but do agree that they do not require a finding that the instruments were drafts.
The way the documents were prepared and the various other internal evidences of inaccuracy and correction of errors, etc., lead me to conclude that the documents were drafted by a layman. Indeed, I believe these documents were prepared by Thomas Bata without direct professional assistance and, as will be shown later, this was done deliberately in my opinion and with full awareness of the estate tax problem which would be created by his death if his shares were a part of it. See D-80 III, page 1, as well as certain oral testimony.
In view of the manner in which the papers were addressed and kept and because of certain other documents in evidence, particularly D-80, III, p. 3, I conclude that the May papers were not intended to be drafts. I recognize that plaintiffs contend that Thomas made a will in December 1931 while on a trip to India. But the nature of the proof as to its existence and treatment does not alter my conclusion concerning the May 1931 will in view of D-80, III which speaks of Thomas giving directions with respect to the May will after his return from the trip to India. This brings the court to a consideration of Jan's contention that by the May 1931 papers, when considered with the extrinsic evidence, Thomas intended to create a sales legacy in Jan's favor, which intention must be given effect under governing Czech law.
Under § 552 of the Czech Code a testamentary disposition is called a "last-will declaration". Admittedly a legacy must be made by a valid last will declaration. Czech Code § 647. The validity of a so-called "sales legacy" under Czech law is established.
Defendant's position is not always precise as to what document constitutes the last will declaration which contained the alleged sales legacy. He says variously that it may be found in the May 10 sales agreement alone, or in the May 19 last will alone, or in the two combined.
Can the May 10, 1931 sales agreement be considered a last will disposition to Jan? The language "I sell" and "you purchase" shows that the paper on its face does not contemplate a disposition to Jan at death. On the contrary, its language is the very antithesis of a sales legacy to Jan. Indeed, it is worded more like what we call a sales agreement than an agreement to sell. But conceding that the language of the May 10 paper is sufficient under Czech law to warrant consideration of extrinsic evidence to determine whether it was intended as a testament, I conclude that it cannot be so considered. I so conclude principally because Thomas actually left a document which he himself explicitly designated as his last will and there is no suggestion that he was unaware of the distinction between a sales agreement and a will.
I need not consider whether the documents together constitute a testament containing a sales legacy because I am persuaded that Czech law requires the May 19 paper to be treated as Thomas' last will declaration. Moreover, under Czech law, in my opinion, the sales agreement paper may not by reference be considered a part of Thomas' last will declaration. I say this because I do not believe the last will expressly or tacitly refers to the sales agreement as required by § 582 of the Czech Code, if it is to be considered as part of a last will declaration. After all, there is not even a reference in the will to a date in connection with the claimed sale. Papers other than the testament may of course be used under Czech law for interpretation *190 purposes when extrinsic evidence may be considered. But, as hereinafter shown, I do not believe this conclusion alters the legal necessity for finding some support for the claimed legacy within the language of the written testament itself.
I turn now to one of the basic issues of the case. It can best be presented by stating the contentions of the parties. Defendant's position is that under Czech law "The actual intent of the decedent is a fact of distinct operative significance. The only limitation is that, when it is discovered, a hint or clue to it must be recognizable in the declaration. It may not be completely unrelated to the document. Some support, however slight, must be discernible to the informed reader." As his brief reveals, by this contention defendant says extrinsic evidence may be used to discern the hint, clue or slight support in the document for the intent claimed. Plaintiffs, on the other hand, claim that under Czech law the hint, clue or slight support for the disposition claimed must appear from a reading of the testament itself. If it does not, they say no extrinsic evidence can be used to "discover" it therein.
Preliminarily, I should note that the requirement is variously referred to as "hint", "clue" or "slight support" rule. They refer to the same requirement. I should note also that many of the authorities discussed by the parties relate to the question of whether or not a document or oral declaration constitutes a last-will declaration. See, e. g., PT-1406. We are not directly concerned with such authorities because there exists here a last-will declaration in writing  the May 19, 1931 document. As hereinafter determined, however, I believe the hint, clue or slight support requisite applies not only to the issue of the existence of a last will declaration but also to the issue of the existence of a particular disposition within an admitted last will declaration. (Compare D-1793, p. 2).
It is important to keep in mind that defendant claims that the May 19, 1931 last will contains a sales legacy in his favor. He apparently admits that the hint can only be found here by first considering extrinsic evidence. We thus see the importance of determining whether, a written testament being involved, the hint must be found in the testament alone, or whether it may be found, as defendant says, "after all available sources" are examined (law brief, p. 162). It should be noted that the "hint" test is but an aspect of the animus testandi requirement, i. e., that the intent to dispose upon death appear
For convenience, I repeat the relevant words of the last will: The will states that "My property as of today [May 19, 1931] consists of claim against J. A. Bata for all shares sold * * *".
Defendant places great reliance upon the Austrian Supreme Court case of June 11, 1914 (Rv-1537/13  D-1788) to support his contention that the hint may be found by resort to extrinsic evidence. In that case the testator left a testament which provided, inter alia, that "The statutory (intestate) right of succession of my wife, who is separated from me, remains untouched". I emphasize that a testament admittedly existed and the issue was whether or not a particular legacy was intended. The language of the testament, considered in conjunction with certain oral testimony, demonstrated to the court that the testator intended by the language to bequeath in his testament all that a wife was entitled to in accordance with the rules of intestate succession.
First of all, the opinion does not discuss the requirement that some hint of the testator's intention must appear in the testament. This is understandable since the hint requirement is clearly met by the quoted language of the provision of the testament which lends some support to the contention that it was intended to be in the widow's favor. Moreover, one of the admitted authorities in the field (Ehrenzweig, System of the Austrian General Civil Law, (1937 edition), Vol. II/2 pages 418-19, D-1791) *191 demonstrates by his discussion of this case that it does not support defendant's contention. The following quotation is pertinent:
"* * * Also oral utterances, e. g. to the draftsman of the testament, are to be considered9. Example: The testator had declared in his testament: `The statutory right to heirship of my wife, who is separated from me, remains untouched'. Later on, the wife obtained a divorce and remarried. According to the testimony of the attorney who had drawn up the testament, the testator had spoken of this possibility, he wanted the statutory portion to be secured to his wife even for this contingency (in spite of Sec. 1266).10 Such a remark, however, could not give a right of inheritance to his wife unless some provision in her favor had been incorporated into the testament. For the interpretation must have `some, however slight, support' in the testament and `must not be outright contradictory to the unambiguously expressed intent.'11" (emphasis is Ehrenzweig's) [footnotes omitted]
Professor Ehrenzweig thus clearly assumes that the language of the testament in and of itself constituted some support for the conclusion that it was a provision in favor of the widow. The last two quoted sentences make it clear that extrinsic evidence of intention, no matter how strong, would not have been sufficient had there been no support for it in the language of the testament standing alone. It is vitally important to remember that Ehrenzweig recognized that some provision in favor of the claimant must appear in the testament.
Another recognized scholar, Schreier, in his work on "Interpretation of Laws and Legal Transactions" (D-1865, pages 1-2) had this to say:
"It appears from this rule that regarding last-will dispositions also no full theory of intent prevails in such a manner that no limits whatsoever are set to the free ascertainment of the intent, rather, the intent finds a limit in the language of the last-will disposition which we will define even more precisely. Thus an intent that is entirely outside of the language of the last-will disposition is not valid in any event as a last-will disposition, not even if it can be clearly proved. Thus, if the testator intended to leave a legacy to A, but forgot about it when he made his testament, A will not receive the legacy even when it is established that the testator declared before and after making the testament that A should receive a legacy and was of the opinion that he had left one to A."
Defendant argues that the example given by Schreier shows that he is referring to a situation totally different from that here involved. Certainly the example is extreme (where testator forgets to make a legacy) but it shows that even in the case of an admitted testament, where an intention to make a particular disposition is claimed, it is subject to the same, hint, clue or slight support test as in the case of an issue as to whether a document is a last will declaration. See D-1793, p. 2. It is not entirely clear whether defendant's expert witness testified at variance with defendant's present contention (cf. R. 7357).
I believe the Austrian Supreme Court case decided July 18, 1952, (SZ XXV 203  D-1784) is also significant on the point under discussion. In that case the testator left a written testament and a written supplement both of which clearly provided for a legacy in favor of his daughter, Edith. I emphasize that there was no doubt that a written testament existed. From this point I shall quote the court, (the underlined portion being most significant on our issue):
"* * * The primary issue, therefore, is whether, on the basis of the testator's intent, the legacy shall be paid out of specific items of the estate.

*192 "The Court of Appeals holds that the intent of the deceased can be deduced only from the last will dispositions. The Supreme Court does not share that opinion. For the interpretation of a testament, oral remarks as well as writings not referred to in the testament, have to be taken into consideration. It is true that the interpretation of a testament must have some, however slight, support in the testament and must not be totally contradictory to the clearly expressed intent of the testator. The last will dispositions in the case before the court do by no means clearly indicate that the legacy shall be paid out of specific items of the estate, especially if the provisions of Par. 6 of the declaration of August 9, 1941, and the provisions of the testament of June 28, 1944, are literally interpreted."
There was of course a legacy to Edith and the issue was whether the testator intended that it be paid out of specific items of the estate. The court recognized that before a particular interpretation of a document can be adopted it must have some, however slight, support in the testament and must not be totally contrary to the clearly expressed intent of the testator. In obvious compliance with the quoted principles the court went on to consider the language of the documents and to conclude that they did not clearly indicate that the legacy was to be paid out of specific items of the estate. The important fact for our purposes is, however, that language susceptible of supporting Edith's contention appeared in the testament. Consequently, the court concluded that extrinsic evidence was properly considered in arriving at the proper interpretation of the documents.
I infer from the foregoing analysis that the requirement that a particular interpretation contended for must have some, however slight, support in the testament must be fulfilled solely from an examination of the testament itself. Thus, while the case is a defendant's exhibit, I am satisfied that so far as here pertinent it supports plaintiffs' basic approach.
Defendant cites the works of certain authors for the proposition that the hint or slight support need only be found in the light of the extrinsic evidence. An examination of these works does not support defendant's contention.
Defendant says that Dr. Escher, who wrote Vol. III (The Law of Inheritance) of the Commentary to the Swiss Civil Code supports his position. On the contrary, I believe the following quotation supports the view that extrinsic evidence can be employed for interpretation only if a hint for the interpretation claimed is found in the language of the testament:
"* * * An intent of the testator, not contained or even hinted at in the disposition, may not be supplemented from other sources, perhaps oral or written utterances of the testator. But the use of such extraneous sources (outside the testament) is permissible where the wording, hinting in itself at an intent, leaves room for doubts concerning the intent of the testator, * * *" (D-1808A, p. 4).
Klang-Handl in his Commentary to the General Civil Code (first edition) Vol. II/1, p. 124, D-1792A is cited by defendant, particularly for the following sentence:
"* * * Only what is covered by the form may be considered as contents of the last-will declaration, this, however, to the extent of the whole scope ascertained by interpretation. * * *"
[I adopt defendant's translation because I think the difference unimportant here].
I do not think Professor Klang, by the quoted language, intended to state that the hint or slight support requirement could be fulfilled by resort to extrinsic evidence. This is made rather clear from the following language which appears immediately *193 before the quoted sentence relied upon by defendant:
"On the basis that the subjectmatter of interpretation can only be what the testator has not only intended, but has also expressed, at least by way of hinting at it so that it can be made fully understandable by resort to other means of exploration, the question as to what extent consideration of the requirements of form may present an obstacle to interpretation, does not raise any difficulty. Declarations which do not meet the requirements of form are invalid (Sec. 601)."
By the foregoing language I believe the author gives full recognition to the Czech law that the hint requirement must be met in the declaration, apart from the extrinsic evidence.
But defendant insists that "It is not a matter of clarity or lack of clarity of the language on its face that determines whether the intent shall be explored aliunde; it is `the conflicting positions of the parties'; `the doubts usually introduced by the interested parties', which requires that the intent be explored and ascertained".
It will be noted that in support of his contention defendant quotes the words, "the conflicting positions of the parties". This language appears in the opinion of the Czech Supreme Court of June 19, 1935, Rv-1119/34 (D-1781, page 3). In that case there was a last will disposition wherein the testator directed that a certain house should pass to the defendant. However, he was obligated to pay his brother and sister each one-third of the net worth of the house after deduction of the liabilities outstanding on the house. There was a written declaration and the doubts which were introduced related to possible meanings of a particular disposition, viz., whether a certain mortgage was to be considered as a liability in computing the net worth of the real estate.
After stating the issue the Supreme Court said:
"The decision depends on the construction of the last disposition of Ernest H. of March 7, 1929. In view of the conflicting positions of the parties one cannot limit oneself to the wording of the pertinent provision of the testament and it is necessary to ascertain the real intent of the testator and the intention which he had when said disputed provision was drafted, because testamentary succession is based on the intent of the testator which shall be ascertained also on the basis of circumstances which are beyond the contents of the testament."
Obviously the case dealt with a situation where interpretation was permissible, because there was admittedly a last will declaration containing an admitted disposition to a particular individual and the doubt was as to the scope of the disposition. It is not authority for the position that the hint of a disposition in the testament can be discovered by the use of extrinsic evidence.
The second quotation relied upon by defendant is the language: "the doubt is usually introduced by the interested parties". This quotation is from the scholarly work by Klang-Handl (D-1792, page 3). First of all, because of the limited scope of this quotation, it does not give the full picture of what was intended by the author. The full sentence reads as follows: "This overlooks that the declaration need not be unclear by itself but that the doubt is usually introduced by the interested parties". The quoted "This" is a reference to a decision of an intermediate court, later reversed, which announced a rule limiting interpretation to cases where only the language of the disposition is "obscure and un-understandable". The author's criticism, which was apparently later upheld, dealt with a situation where there was some basis in the declaration for the interpretation claimed. This is made evident by the fact that in a preceding portion of the very *194 same paragraph, the author states that "supplementing interpretation may take place, only then, `when the declaration itself offers some basis for supplementing the declaration'". The author then cites Schreier as supporting this proposition. And, Schreier, in my opinion, supports the principle that the hint must be found in the document apart from the extrinsic evidence.
Defendant also places great reliance on Pfaff-Hofman's Commentary to the Austrian General Civil Code (Vienna 1877) Vol. II/1, pp. 453, D-1872). Neither the excerpt quoted by defendant nor the footnotes state anything contrary to my interpretation of the requirement under discussion. The text states that a legatum debiti (intent to create a legacy of a debt) may be found from language reciting the existence of a debt owed the claiming party plus the surrounding circumstances. The animus legandi will be assumed, where the contrary is not evident, since testaments and codicils have the purpose to dispose of property. The situation covered by Pfaff-Hofman does not touch our issue because it deals with a situation where a testament contains a provision possibly favoring the party who was making the legacy claim. The hint, clue or slight support requirement is assumed to exist in the situation presented. It is the issue here.
In arguing that the animus testandi may be found by resort to all kinds of extrinsic evidence despite the language of the instrument, defendant lays great stress upon the following quotation from Klang-Handl (D-1798):
"The wording is not always decisive; even where it seems to rule out animus testandi, it may be assumed, considering all the circumstances5."
Footnote 5 is as follows:
"5. Decisions 5/30/1860, G1.U. 1143: `What for a testament? Everything belongs to you anyhow.' 9/13/1891 G1.U. 13887: Designation of a complete testament as a draft."
The Klang-Handl discussion is primarily concerned, as the footnote indicates, with the issue as to whether certain oral or written words in the circumstances constituted a last will declaration. On the basis of the footnote cases it may be inferred that the author was dealing with a situation where there was a provision in favor of the claiming party and the only issue was whether it was made animo testandi. I find nothing to indicate that the language was intended to express a view contrary to my above announced conclusion with respect to the hint requirement of Czech law.
Defendant cites numerous other cases for the proposition that the hint or slight support need only be found in conjunction with the extrinsic evidence. In every one of the cases cited there was testamentary language itself giving some support to the contention of the claiming party. Let us consider them.
Austrian Supreme Court decision (May 30, 1860, D-1800). Oral will found from the following words:
"What do we need a testament for? There is no need for it. Everything as it is belongs to you [wife] anyway. Nobody can take anything away from you."
The words "Everything as it is belongs to you anyway" certainly is some support for the contention that the testator intended his wife as his testamentary heir.
Decision of the Austrian Supreme Court (June 25, 1924, D-1801). Oral declaration by husband, "Everything belongs to my wife". Here again the language, as the court must have recognized, is certainly slight support for the widow's claim of testamentary heirship.
Decision of the Austrian Supreme Court (September 27, 1882, D-1802). Provision in written testament that, "* * * A savings book with 200 fl. and another one with 94 fl., have been issued in my name, but they belong to the church A; as do *195 200 fl., which I lent to a priest, * * *". The church claimed, inter alia, a legatum debiti of the 200 fl. "lent to a priest". Passing over other distinguishing features, it is once again apparent that the language of the testament gave some support to the church's claim.
There are numerous other decisions relied upon by defendant, D-1792B, D-1809, D-1807, D-1809B, D-1872-f. 104, D-1873; see also D-1808, D-1806, D-1804. Leaving aside other possible distinctions, the fact is that in every case there was some provision in favor of the claiming party which at least supplied a hint to support his claimed interpretation.
I also note that defendant claims the testator "disguised" the legacy to him by employing language of past sale. The disguise was motivated he argues by a desire to avoid taxes and to escape disclosures concerning foreign holdings. I recognize that there can be a disguised legacy under Czech law but I note that in all the disguised legacy cases there was some provision possibly favoring the claiming party. The disguise related solely to the form of the transaction. See e. g., D-1873, D-1872, n. 104, D-1808. By way of contrast, in this case there is no provision at all in the will in defendant's favor. The will, inter alia, makes specific dispositions of the proceeds of an identified claim and Jan is merely identified as the person against whom the claim exists.
Defendant also stresses the applicability of the doctrine of favor testamenti. At times this concept appears to be nothing more than another term to describe the process employed to assist in ascertaining the testator's real intent. At other times it is applied to the situation where the court is doubtful as to whether or not a disposition was intended. In such a case the principle favors an interpretation which makes an effective disposition.
Neither aspect of the principle alters the requirement that the testament itself must contain some support for the position of the claiming party. This is made clear by the italicized words in the following quotation from the Klang-Weiss, Commentary to the General Civil Code, Vol. III, (2nd edition), pp. 218-229, D-1793:
"There is a very urgent need for an interpretation of declarations mortis causa which endeavors to find the actual intent of the decedent: Not where there are two possible interpretations at issue, one of which answers in a higher and the other in a lesser degree the decedent's design; but where there is the only choice between, on the one hand, a construction (upholding the will) which finds some support in the wording, and on the other, a construction declaring the last-will declaration ineffective."
I conclude that under Czech law the hint, clue or slight support for the claimed disposition (here a "sales legacy") must be found in the language of the testament.
As I read defendant's brief, it is conceded that the hint, clue or slight support cannot be found from the language of the May 19, 1931 will alone. If my understanding of defendant's position is incorrect, and defendant contends that the hint appears from the language of the will alone, then I say that in my opinion the last will document itself does not contain a hint, clue or slight support for the claimed intent to create a sales legacy in Jan's favor. My conclusion is based upon the admitted fact that on its face the will contains no provision in Jan's favor. The will itself clearly gives to identified persons and entities the proceeds of a claim arising from a past sale to Jan (6807-08). Jan is merely identified as the person against whom the claim exists. There is no hint of a bequest to Jan.
As I find the Czech law and without regard to the testator's actual intention, it must be concluded that Thomas Bata did not by his May 19, 1931 last will create a sales legacy in favor of Jan. Other important contentions concerning this aspect *196 of the case therefore need not be considered.

Constitutive Recognition
Defendant next contends that even though the sales legacy issue based upon last will interpretation is determined against him (as it is) he is, nevertheless, entitled to the shares because the heirs entered into a contract with Jan by which they recognized him as the legatee of a sales legacy (7437). This contention is based upon the Czech doctrine of constitutive recognition. This doctrine, which admittedly has no Code definition, may be generally stated as follows: "Recognition is a contract whereby without mutual concession by the parties a given legal relationship is determined. The agreement on recognition, therefore, is not a mere admission of a fact, but is in the nature of a disposition concerning a legal relationship in the same way as a compromise". (Czech Supreme Court, D-1813). This recognition is an independent source of obligation (D-1819).
The Austrian Supreme Court has said, and defendant agrees, that it is a question of fact whether the party sought to be held "intended to commit himself anew * * *" (D-1820). I emphasize the necessity for finding an "intent to commit anew" and the fact that constitutive recognition "is based on the principle of freedom of contract * * *" (D-1822).
Defendant seems to recognize that under the doctrine of constitutive recognition he has the burden of showing that plaintiffs were parties to a new obligation with Jan which was created after Thomas' death. Defendant concedes that Tom and his mother did not expressly enter into any such new obligation. But he contends that Tom and his mother did so tacitly as evidenced by their subsequent conduct in accepting and carrying out the wishes of the decedent as expressed in his two May 1931 documents.
The Czech law permits the recognition to be tacit but, in such a case, as the Austrian Supreme Court said, "* * * a tacit declaration of intent can be assumed only if the facts, with consideration of all circumstances, do not leave any ground for a reasonable doubt as to the intent of the party". (Decision of October 21, 1891, D-1829).
The principal factual contentions urged by defendant can be summarized as follows:
(1) Tom and his mother were aware of the existence of the sales agreement shortly after Thomas' death.
(2) Tom and his mother allowed Jan to take into his hands the control of the Bata concern.
(3) They executed all documents required of the statutory heirs to complete the transfer of record title of certain shares to defendant.
(4) They accepted the book credits as fulfillment of the legacies provided for them.
(5) They understood the will to express Thomas' wish as to what should happen.
(6) They carried out the disposition in the disguised manner which he had provided.
(7) They executed a formal statement in the estate proceeding designed to effectuate Thomas' disguised disposition. Defendant emphasizes that the Dutch court found that these actions of plaintiffs in the court proceedings had "dispositive significance" regardless of whether the will gave Jan a valid title for the obtainment of ownership.
(8) For the next approximately 12 or more years plaintiffs "went along" with Thomas' intention.
I believe the following discussion considers each of the "factual" allegations relied upon by defendant.
*197 There can be no doubt that after Thomas' death, Tom and his mother did everything required to put Jan in a position from which it appeared that he had taken over the Bata shares pursuant to an inter vivos sale from Thomas. This is evident from the numerous documents executed by them transferring legal title to various Bata shares to Jan.
While the matter is disputed, I shall assume, as defendant contends, that shortly after Thomas' death, Tom and his mother were aware of the paper which we have called a sales agreement. I note, however, that it is not clear that the heirs were made aware of the facts surrounding Jan's signing the sales agreement paper or that there was any suggestion to them that it might be legally infirm.
Under Czech procedure Tom could be declared of full age when he became 18 years old. This procedure was followed on September 21, 1932. Although there is a dispute as to the reason for deciding to adopt this procedure, I believe it was done primarily to avoid minute inquiry into Thomas' estate which would have otherwise been required by the Czech court for the protection of a minor. Thus the purpose once again was to assist in perpetuating the fiction of an inter vivos sale.
Defendant emphasizes particularly the declaration filed by Tom and his mother in the estate proceedings. He contends that by recognizing an inter vivos sale at a time when they knew that the documents were left by Thomas so that they could only be found at his death, Tom and his mother recognized that Thomas had created a sales legacy, citing an Austrian decision (D-1760A, n. 11).
The language of the declaration found in the transcript of the estate proceedings recites in part that "Because Jan A. Bata has settled this amount (57,262,131) with the firm Bata, a. s. in Zlin to the benefit of the testator Thomas Bata, this property of Thomas Bata appears, as of the date of his death, as a claim against the firm". It is also said, "The following shall obtain: from the claim of the test[ator], Thomas Bata, against the firm Bata, a. s. in Zlin," then Tom and his mother, inter alia, are listed to receive certain amounts (D-90).
The foregoing language on its face helped to implement the fiction of an inter vivos sale. While it is contended that Tom and his mother were not present at the proceeding, I conclude that they must be held to have had knowledge thereof. Although Tom and his mother must therefore have been aware of the fiction, I do not believe that by the quoted language they agreed to recognize a sales legacy in favor of Jan. After all, the sales legacy theory was apparently not even "discovered" until many years later and after litigation commenced. This is imoprtant because we are talking about a contract when we speak of constitutive recognition.
Other facts cast great doubt upon the right to find tacit recognition here. Jan was unaware of much of the important evidence now relied upon to show tacit recognition. He testified that he was not aware of the statement signed by the heirs in the estate proceedings. This is important because a declaration made by plaintiffs to a third person would not impose upon them any obligation toward defendant (D-1829). It should be added that recognition alone will not result in the acquisition of ownership (p. 1425).
But even more important, Jan himself has in his testimony in the various actions here consistently stated that there was an inter vivos sale. His claim to the tax authorities was based on the same inter vivos transaction. These facts are necessarily inconsistent with an intention on his part to accept the subsequent actions of the heirs as recognition of a new agreement.
Finally, I find no basis to indicate that Jan on the one hand and Tom and his mother on the other were conscious that there was any incomplete or doubtful situation to be resolved after Thomas' death. *198 Thus, even under defendant's formulation of this requirement, the necessary factual basis is absent.
Defendant stresses that Thomas' widow testified in the New York trial that she understood the will, "* * * to express the wish of Thomas Bata * * * As he pictures or imagines the last will  his idea of what should happen." (p. 4014 of New York transcript.) This was consonant with an understanding that the arrangement had been created by Thomas but certainly it does not show any intent to make a new agreement with Jan.
Defendant also emphasizes the following facts: by the terms of the will Tom had received a legacy of $660,000 and the widow had received the city and country estates plus about $150,000; they never heard of a sale by Thomas in his lifetime and they knew he had not relinquished any aspect of his authority before his death; they "must have been aware" that the business was worth materially more than 50 million crowns; Jan had not paid any part of the price  indeed, he could not have paid it personally. To summarize, they knew that there had been neither delivery nor payment of the unusual "purchase" price. (Defendant's fact brief, p. 226.)
The foregoing facts, particularly when considered in conjunction with those discussed above, do not point to an intent on the part of the heirs to agree anew with Jan to "carry out" a sales legacy in Jan's favor. Rather, they are equally consistent with the intent on the part of the widow and young son to "go along" with the fiction of a sale. One can hardly imagine any question being raised which would tend to throw doubt upon the scheme when one considers the consequences of such action  consequences which must have been clear to all the management of enterprise, including Jan.
While the heirs did not attack the fiction for a good many years I do not believe such lapse of time evidences tacit acceptance in view of the evidence concerning the original transaction and the other facts discussed. I emphasize again that we are here concerned only with the existence of a new agreement between defendant and the heirs.
I conclude that the doctrine of constitutive recognition is not available to defendant under the facts of this case because I find that Tom and his mother did not enter into any recognition contract with Jan. In any event, the same result follows under Czech law since I am satisfied that the evidence at least leaves room for reasonable doubt that either Tom and his mother or Jan ever intended to enter into such a contract.

Tacit Waiver or Disclaimer
Defendant next argues that under the doctrine of tacit waiver or disclaimer the plaintiffs are precluded from asserting their title to the property here involved. Since plaintiffs are, in view of previous rulings, claiming the property in dispute as the owners thereof, it would seem reasonable to impose upon the defendant the burden of establishing that the Czech principles of tacit waiver (which involve the good faith concept) preclude plaintiffs from claiming ownership. I should emphasize that the property consists not only of the Leader shares but also of shares of the Delaware corporations which were created years after Thomas' death.
Since defendant uses tacit waiver and disclaimer interchangeably I shall hereafter only use the expression "tacit waiver".
I believe defendant's argument can best be understood by quoting the material on the subject appearing in the Klang-Gschnitzer Commentary To The General Civil Code (PT-1415):
"Continuing failure to exercise a right means waiver of the right where, considering the circumstances of the particular case, the other party was justified in relying on the assumption *199 that the transaction had been finally wound up. Where the delay took place in order to speculate at the risk of the other party or where the belated assertion becomes improper due to changed conditions, the concept of acting contrary to good faith is referred to in addition to the concept of tacit waiver."
Plaintiffs assert several reasons why the doctrine is inapplicable to the present case. Plaintiffs' principal contentions and defendant's answers may be summarized as follows:
1. Rights in property cannot be lost through any concept of tacit waiver because it has no application to in rem rights. Defendant denies that the doctrine of tacit waiver is so restricted.
2. Tacit waiver is solely a matter of defense which is only available to a person in possession. It does not confer ownership. Defendant first appears to agree that he must show "possession" to assert the tacit waiver defense. He contends that he should be here considered as though he has possession and is defending it against plaintiffs' claim. His reasoning is that the "Bata concern" was transferred to him and in such a case physical delivery of each item of the concern is unnecessary where the custodian (presumably referring to the party having physical possession of the Leader bearer certificates) accepts the authority of the transferee. He appears to suggest, alternatively, that in an action where a custodian has deposited property in court, which was not in the possession or control of either claimant, the possession and control requirement is not a prerequisite to the application of the tacit waiver doctrine.
In order that the discussion may be kept in focus I think it desirable to restate some of the matters which must be treated as established for purposes of the decision on the issue of tacit waiver. There was no inter vivos sale by Thomas to Jan. By accepting, unconditionally, the deed of delivery of the entire estate, the heirs (Tom and his mother) became vested under Czech law with the ownership, inter alia, of Thomas' shares (including Leader), subject to the duty to pay debts and legacies. Since Jan received no sales legacy either by will or under the doctrine of constitutive recognition, Tom and his mother, as intestate heirs, continued to hold the Leader shares, inter alia, as absolute owners.
The question now is whether under the doctrine of tacit waiver the heirs are precluded from asserting their ownership to the Leader and other shares here involved because of their conduct after Thomas' death.
In resolving the tacit waiver issue, I shall assume, as defendant contends and plaintiffs deny, that the defense is applicable to an ownership (in rem) action. This brings the court to the second major contention of the plaintiffs, viz., that the defense of tacit waiver is not here available to the defendant because he was not and is not in possession or control of the property involved.
Defendant at least tacitly concedes that in the ordinary action by an owner against the possessor of property, tacit waiver is a matter of defense and the person asserting it must show that he has absolute control or possession of the property involved (7436). Defendant contends that by virtue of taking over the "Bata concern" he at one time had what amounts to constructive possession of the Leader shares. He apparently argues that this "possession" exists today at least for the purpose of fulfilling that requirement of tacit waiver. He so argues although the property in question was not subject to his absolute control or physical possession when this action was commenced. He asserts that Muska (the trusted "lieutenant" who died before the dispute broke out) kept the Leader shares for him as he had for Thomas. In fact, defendant contends that during one period, through a joint safe deposit box with Muska in a London bank, he had free access to all the Leader shares.
*200 I am unable to find that defendant ever had what amounted to physical possession of the Leader shares here involved. My conclusion is based largely on Jan's unfamiliarity with the "whereabouts" of these important certificates over the years and indeed his relative "indifference" with respect thereto.
Does Jan have constructive possession? In answering this question I shall assume (apparently contrary to plaintiffs' contentions) that constructive possession could be obtained under some circumstances by "taking over" an enterprise. There can be no doubt that the Swiss mandatories considered Jan as the "chief" of the enterprise after Thomas' death. But the mandatories were not concerned about title as between the Batas so long as there was no dispute as to the identity of the person entitled to give orders to them. Indeed, undue curiosity could be embarrassing and the Swiss mandatories were certainly "sophisticated" in the ways of European financial matters. The control of the Leader shares remained after Thomas' death primarily the concern of Muska, one of the other important lieutenants in the enterprise. Since Jan "took over" the business in furtherance of the fiction, indifferent (in my opinion), to legal rights, I cannot find that Jan ever had "possession" of the Leader shares in the sense required by the tacit waiver doctrine.
As I read defendant's law brief (p. 298-9) he contends, apparently alternatively, that where the custodian of property has deposited it in court for purposes of having the rights of the parties therein determined, and "* * * where the two claimants face each other in a court having jurisdiction to determine in personam issues between them, the issue of tacit waiver may be availed of and adjudicated". To emphasize this point he asserts (contrary to plaintiffs' contention):
"There is no requirement that the party who is entitled to raise this issue must himself be in possession of the disputed property." (Law brief, p. 299)
Defendant's expert testified that "the remedy of tacit waiver does not create ownership, but only defeats a special ownership claim under certain conditions * *". Thus, under Czech law an owner does not lose his ownership where a tacit waiver is recognized but merely loses his right to assert such ownership (7423); see decision of Austrian Supreme Court, November 28, 1952; compare PT-1417. This refinement has practical importance because plaintiffs are, in view of my prior rulings, admittedly the owners of the property in dispute and defendant seeks to prevent them from obtaining possession under the doctrine of tacit waiver. May the doctrine be employed where, as here, the defendant had neither possession nor exclusive control of the property at the time the custodians deposited the property with the court? I am unable to accept the testimony of the defendant's expert that in such a situation under Czech law the question of the defendant's possession is, in effect, irrelevant. The expert cited no authority for the precise point involved and gave no reason why the ordinary possession or control requirement of tacit waiver should be inapplicable where as here there are two claimants to the property, but one is admittedly the owner.
In this action, plaintiffs and defendant both assert ownership of the property. Defendant is not defending a claim by plaintiffs for the delivery of property in his (defendant's) possession. Obviously then, he is not using tacit waiver as a defense. Yet tacit waiver can only be used to defend exclusive possession or control under the Czech law as I find it. Indeed, in his earlier testimony the defendant's expert discussed the doctrine in terms of "defense". However, later in the trial, when the "difficulties" involved in applying the doctrine defensively became apparent, he apparently took the position that his earlier discussion was not intended to refer to a situation such as is now before the court, namely, where a custodian places property in court and where such custodian at the *201 time is not subject to the exclusive control of the person relying upon tacit waiver. None of the cases relied upon to support the doctrine shows its use as an affirmative remedy. To deliver possession to a claimant who did not have possession or exclusive control would constitute affirmative action smacking of ownership vindication. It would thus be inconsistent with the law, as stated by defendant's expert, that tacit waiver cannot create ownership in the person relying upon the doctrine (7420-21).
I therefore conclude that under the facts of this case the defendant, not having been and not now being in possession or exclusive control of the property here involved, cannot defeat a recognition of the plaintiffs' ownership rights in this action under the defense of tacit waiver.
While this ruling disposes of the tacit waiver defense, I believe that even if the defense is considered on the facts it is without merit because the facts leave the matter in such doubt that it should be resolved against defendant. Admittedly, neither Tom nor his mother executed any instrument transferring title to the Leader bearer shares to Jan. Consequently, Jan must rely upon the facts to render the principle operative. Let us consider some of them.
There can be no doubt but that Tom and his mother, after Thomas' death, cooperated fully to implement the fiction that Thomas had sold the shares to Jan during his lifetime. And there can be no doubt that Jan was the "chief" of the enterprise from 1932 until the early 1940's when he was forced to go to Brazil because his name appeared on the British and American Black lists. Nor is it disputed that during those years he managed the growing enterprise with great effectiveness. But the basic problem remains as to whether Jan was, under the circumstances, justified "in relying on the assumption that the transaction [involving ownership succession to the Bata enterprise] had been finally wound up".
The assumption which can be ascribed to Jan can only be found from an analysis of the evidence. Of course, Jan testified that he had an oral inter vivos arrangement with Thomas but this has been rejected in at least one other court. Under all the circumstances I am unable to conclude that he acted on the assumption that the transaction was finally wound up on the basis that he believed he was the purchaser pursuant to an inter vivos purchase.
I conclude that Jan was aware that the arrangement created by Thomas was intended primarily to create the fiction of an inter vivos sale principally to avoid the payment of heavy estate taxes on the fair value of the business. I further infer that Jan was aware that the assets were far more valuable than shown and that in consequence, he was aware that amounts allocated to the widow and son were far less than the equivalent portions of the fair value of the assets. Thus to say that Jan was justified in believing that the transaction was finally wound up we would have to find that he believed Thomas "sold" him the business for about 20 to 25 per cent of its fair value. Obviously this required him to believe that Thomas was making a gift for the most part although he was at the time "grooming" his son to succeed him.
I believe that Thomas also adopted the fiction to avoid the disclosure of some of his foreign operations which might have caused serious embarrassment to the Bata name and business in Czechoslovakia. It will be noted that the very valuable Leader holdings were not identified in either May 1931 paper. Jan must have had some inkling of this "second" purpose of Thomas in adopting the fiction, though how precise it was, I need not consider here.
It will be noted that the only "payment" by Jan was a debit entry on the books of Bata, a. s. This was an arrangement which was accepted by all including Jan since literal compliance with the terms of the so-called sale in this respect would have been impossibly burdensome. Defendant says these entries constituted "payment" of the sales legacy while plaintiffs say there was *202 no payment (and the New York court agreed). Once again I believe the "payment" was handled in this way merely to implement the fiction of a sale.
Other factors are important as showing that in Jan's mind, as well as in the minds of the other leaders of the enterprise, it was important to carry out the fiction without regard to "legal rights" as between Jan and the heirs. Some have been previously mentioned in the opinion. Although it was made to appear on the Bata, a. s. books that the inheritance tax payments on the assumed inheritance were charged to the heirs' accounts, the fact is that an equivalent credit was granted them on the Leader books. Certain of the real property involved was not, insofar as legal title was concerned, in a position where Thomas could will it to the widow (because they were titled in name of Bata, a. s.). Yet the properties were conveyed to her with Jan's approval. These factors as well as others too numerous to mention show that effectuation of the fiction of an inter vivos sale was the important thing and the determination of the rights of the parties inter sese a matter of relative indifference. Of course defendant explains these actions on the basis of his desire to carry out Thomas' intention as expressed in his will without regard to legal niceties but the evidence in its broad sweep compels me to base it on the fact that everyone cooperated to carry out Thomas' scheme although it had many "bugs" which required improvization.
I therefore conclude that Jan recognized Thomas' true purpose in leaving the documents and took over as chief in furtherance of the fiction. Obviously, as Thomas must have been aware, the fiction would not have had any chance of acceptance had it purported to reflect a sale to the widow or to the minor son of Thomas. One naturally asks why Jan was selected. A substantial answer is found in the fact that he was the only eligible Bata in the higher echelon of the business. Moreover, Jan was very close to young Tom, in fact, he was his Godfather. Also, Jan had substantial experience in the business. A "sale" to him had a veneer of actuality.
It is interesting to note that in his 1918 will, Thomas left his then five year old son and his widow substantial interests in the enterprise (D-68). This will became a matter of public knowledge at his death. The May 1931 will revoked his "previous testament" which I infer was his 1918 will. I think it is reasonable to infer that Jan was aware of the scheme of the 1918 will after Thomas' death. At the time he drew his 1918 will Thomas was seriously ill. Because of its importance I quote at some length from that will:
"With the income of my son, up to K. 50,000 my wife may dispose of, above that the decisions shall lie with his Guardian. The entire management of the firm (struck out: `until my son becomes of age', and substituted herefor:) for five years I entrust to Mr. J. Blazek. For that purpose I transfer the voting right from my son to the said Mgr. Blazek, that is, to the extent of 45%, with the balance of my son's votes being transferred to Dr. Hodac. The voting rights under the shares of my wife, until my son becomes of age, I transfer to Dr. Janos. After five years 25% of my son's voting rights shall pass from Manager Blazek to J. Bata (my brother), with the rest of voting rights remaining unchanged.
"After my son has become of age, his personal voting rights reverse to him.
"Of the present personnel, until my son's becoming of age, the following may not be given notice of dismissal:
 "Jan Bata
 "Leopold Bata
 "Bozena Klaus (ova)
 "Maria Bartus (ova)"
It is significant not only that he separated ownership from control but that he was concerned with administration during Tom's *203 minority. When Tom came of age even Jan was to be subject to his control. Of course the business and conditions changed greatly between 1918 and 1931 but Thomas' attitude toward his son and wife did not.
Certain writings (e.g., "moral testament") and speeches of Thomas are stressed by defendant as tending to show that Thomas intended to treat the business as though his son was not entitled to any priority as his successor. Defendant repeats the words from a 1927 article by Thomas in which he spoke of his thousands of sons and said, "I shall leave my fiddle to the best of them all" (D-4, pp. 300-302). Jan says this shows that Thomas was primarily concerned with the success of the business. The court must note, however, that at this very time he had a will giving beneficial ownership of most of the enterprise to his son and wife (D-68, D). Thus his words, assuming they were known to Jan, cannot be given the full importance which defendant now ascribes to them. Incidentally, the article also shows that Thomas expected to be living when his son was grown. Thus, Thomas' words must be read in the light of his actions in grooming Tom to take over and in conjunction with the other matters mentioned. Thomas' 1918 will indicated that paternity spoke louder than words.
It is also evident that Jan recognized that Thomas was grooming his son to take over the enterprise and in fact Jan himself testified that he continued to follow that procedure with respect to young Tom after he took charge. Not until years later did his attitude change. It is also significant that others in the enterprise continued to take action designed to perpetuate the fiction of an inter vivos sale although they must have known that there was no such sale. The defendant must have been aware of some of these actions and their purpose.
It is true that Jan was made the record owner of certain shares by virtue of documents signed by the heirs and it is also true that the books of Bata, a.s. showed Tom and his mother as being owed the amounts of the legacies mentioned in Thomas' last will. This and other evidence is relied upon by defendant but it is all consistent with an intention to carry out the fiction created by Thomas. Certainly, at the time they were doing these things both parties were aware that Thomas had not sold Jan the business during his lifetime and Jan at least was aware that the enterprise was worth much more than the "sale" price fixed by Thomas.
It is noteworthy that after Thomas' death Jan approved the continuation of the practice by which Bata, a. s. absorbed many of the widow's bills. It may also be noted that in the thirties Jan himself substantially duplicated in Tom's favor the two-document transaction of Thomas, although making provision for his own family. Obviously this was to be another "fiction" and is some evidence to show how he understood Thomas' papers. It loses its importance as showing an act of ownership by Jan when it is considered against the background of what I find was Jan's then understanding of Thomas' action and the further fact that at that time Tom was only in his early twenties and had not yet fully justified himself in Jan's mind.
In a sense this case can only be understood by realizing the stature of Thomas Bata and his business in the small country of Czechoslovakia. He was the absolute owner of the largest business in the country and employed thousands of people. At the time of his death, he was admittedly a strong leader whose "word was law" to his family and his associates. The evidence shows clearly that he was actively concerned about the problem of heavy estate taxes shortly before the dates the 1931 papers bear and that he did not look kindly upon payment of heavy taxes. Indeed, the inference is warranted that he realized that if all of his business assets were included in his estate for tax purposes it would imperil his business in a very real sense. The rate for a wife and child was 26%. This is to be contrasted with the 2% tax on written sales agreements. These *204 factors plus the inaccuracies in the will and the physical facts surrounding the documents lead me to conclude that Thomas alone concocted and created the scheme which is evidenced by the May 1931 documents. In contrast, his 1918 will was prepared with the assistance of a notary and reflects a "direct" approach to inheritance which was not influenced by the subsequent substantial increase in the value of his holdings.
If one is surprised that the Czech tax authorities did not look through the fiction the reason is not too hard to find. Certainly, they had no desire to kill the goose that laid the golden egg, which Bata was to Czechoslovakia. Moreover, Thomas had been a leading citizen of the Republic. Thomas had arranged matters in such a way that the taxing authorities had an excuse for "going along" with the fiction of an inter vivos sale.
In the setting I have described it would have been unthinkable that young Tom and his mother would have "rocked the boat" by raising some question about the validity of the known fiction. It is in this sense that I understand the widow's testimony that she, in effect, was going along with Thomas' wishes. It must also be remembered that young Tom was in the business but certainly was not sufficiently mature to be the chief. So far as appears, neither Tom nor his mother sought or had independent legal counsel during this period although they did have a relative who was so trained and presumably available.
I am convinced from the evidence that Jan was aware that he was designated by Thomas in furtherance of the fiction and that he did not in the earlier years consider himself the absolute owner of the so-called Bata enterprise. It is true that in the later years of his control he took action which is some evidence of ownership ("firing" of Tom in 1939) but in view of the time when it occurred and in the light of the then existing situation, it is not sufficiently strong to sustain defendant's burden.
One may ask why Tom and his mother did not assert any claim of ownership until the forties. Parenthetically, it is argued by plaintiffs that they first raised some such point in 1939 but I find the evidence so doubtful on this point that I am willing to assume that the real ownership dispute broke out in the forties. However, I have no doubt that the "makings" of the dispute were evident before that time.
As to the period between 1932 and the beginning of World War II, I think it is clear that, apart from Tom's immaturity and his mother's status, they could not have thrown doubt upon the fiction without subjecting Thomas' stature and the business to serious consequences. Moreover, Jan's actions were not necessarily inconsistent with the view that he was merely effectuating the fiction created by Thomas and was training Tom for succession. Certainly there is room to find an element of trust existing between the parties which "flavored" the situation.
When World War II broke out in 1939 Tom was only 25 years of age. Thereafter the war caused great confusion and prevented access to Czechoslovakia to an ever increasing extent. Thus, accepting as fact that plaintiffs did not clearly assert any ownership rights before the middle forties, I am inclined to conclude that the problems of the war period were such that the activities of the parties during that time are not decisive in resolving the issue now under discussion. Thus, even Jan's statement to the authorities in which he, in effect, denied knowing who owned the Leader shares cannot be considered decisive under the circumstances. Indeed, much of the evidence of happenings during the war years confuses rather than assists in resolving the basic issue. It represents actions taken for a purpose (to avoid seizure as enemy property) which is not necessarily related to the dispute here.
I therefore conclude on the facts that Jan has not sustained his burden of convincing the court that, considering the circumstances of this case, he was justified in relying *205 on the assumption that the transaction had been finally wound up. (Compare D-1843, p. 3). Nor do I believe it can be said that by asserting their ownership plaintiffs are acting contrary to good faith. Thus, plaintiffs are not precluded from asserting their ownership claim because of any tacit waiver. Other contentions of plaintiffs under this issue need not be considered.

Motions to Strike
The parties, particularly plaintiffs, have filed elaborate motions to strike exhibits. Defendant's motions will be denied. Plaintiffs' motion to strike all defendant's exhibits because they are irrelevant in view of the New York judgment will be denied. Plaintiffs' motion to strike exhibits relating to German and Swiss law are denied for the reason that I think the matter goes to weight rather than to admissibility.
Any reasonable allocation of judicial time to this case militates against an explicit treatment of plaintiffs' other three motions. My treatment and conclusions on the various issues posed must be the answer to these motions which basically "go along" with the merits of plaintiffs' contentions. Therefore, in the exercise of discretion, I decline to rule on the motions except as my rulings may be implicit in the conclusions reached herein. This is done solely in the interest of the prompt administration of justice. I cannot find that this approach will prejudice either side.

Conclusion
This case was ably and thoroughly presented. The case was vastly complicated by the fact that the varying positions and testimony of the parties are relied upon endlessly to affect credibility, etc. I have passed over most of such material in the interest of a "direct" determination. The court does not pretend that the case was "easy" to decide. The court has attempted to articulate its basic conclusions. Of necessity I have not explicitly recognized all of the legal or factual contentions relied upon by the parties, but those not mentioned are not deemed to be inconsistent with the conclusions announced herein.
I conclude that plaintiffs are the beneficial owners of the 1170 Leader shares, all of the North River shares as well as 2,200 shares of Westhold Corporation; certificates evidencing such shares being on deposit with the court.
In view of my conclusions with respect to ownership, it follows that since the Swiss courts have so far held that a mandate relationship exists between plaintiffs and the Swiss mandatories, the plaintiffs are entitled as owners to give orders. Therefore, if plaintiffs and the defendant mandatories agree on the mechanics for taking possession of the certificates for the Leader, North River and Westhold shares, the court will implement them with an appropriate order. The same procedure will govern the delivery by the Receiver of the indentures covering the so-called "duplicate" Leader shares.
Present order on notice.
NOTES
[1] While there are "duplicate" stock certificates of a non-negotiable nature outstanding, issued to another Swiss corporation during World II, this court has so far as possible rendered that fact of limited importance by requiring the parties to execute an instrument by which they have in effect agreed that their interest in the "duplicate" certificates, should be determined by the decision here with respect to the bearer certificates. See Bata v. Hill, Del.Ch., 112 A.2d 519; Bata v. Hill, Del.Ch., 113 A.2d 740.
[2] The trial, apart from innumerable pre-trial motions, consumed 100 trial days, created 15,000 pages of testimony, apart from the additional thousands of pages of depositions and of exhibits, many of which had to be translated. To this must be added 1,500 pages of "briefs".
[3] In the discussion, particularly of the foreign law, the court for the subsequent convenience of counsel has given the pertinent exhibit number. The numerals in parentheses refer to the transcript page number.
[4] The use of the word "enforcement" seems to limit the applicability of the statute to suits in Holland on foreign judgment.